**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PIEDMONT ENVIRONMENTAL COUNCIL,
      *Petitioner,*

PUBLIC SERVICE COMMISSION OF THE
STATE OF NEW YORK (NYPSC);
MINNESOTA PUBLIC UTILITIES
COMMISSION,
      *Intervenors,*

    v.

FEDERAL ENERGY REGULATORY
COMMISSION,
      *Respondent,*

SOUTHERN CALIFORNIA EDISON
COMPANY; ALLEGHENY POWER;
TRANS-ALLEGHENY INTERSTATE LINE
COMPANY; EDISON ELECTRIC
INSTITUTE; AMERICAN PUBLIC POWER
ASSOCIATION; NATIONAL RURAL
ELECTRIC COOPERATIVE
ASSOCIATION; AMERICAN WIND
ENERGY ASSOCIATION; SAN DIEGO
GAS & ELECTRIC COMPANY; PPL
ELECTRIC UTILITIES CORPORATION,
      *Intervenors.*

No. 07-1651

STATE OF NEW YORK; STATE OF
ARIZONA; STATE OF CALIFORNIA;
STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;

STATE OF IOWA; STATE OF
KENTUCKY; STATE OF NEW
HAMPSHIRE; STATE OF OHIO;
STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF WEST
VIRGINIA; STATE OF WYOMING,
          *Amici Supporting Petitioner.*

PUBLIC SERVICE COMMISSION OF THE
STATE OF NEW YORK (NYPSC);
PEOPLE OF THE STATE OF NEW
YORK,

                    *Petitioners,*

              v.

FEDERAL ENERGY REGULATORY
COMMISSION,

                    *Respondent,*

SOUTHERN CALIFORNIA EDISON
COMPANY; ALLEGHENY POWER;
TRANS-ALLEGHENY INTERSTATE LINE
COMPANY; EDISON ELECTRIC
INSTITUTE; AMERICAN PUBLIC POWER
ASSOCIATION; NATIONAL RURAL
ELECTRIC COOPERATIVE
ASSOCIATION; AMERICAN WIND
ENERGY ASSOCIATION; SAN DIEGO
GAS & ELECTRIC COMPANY,
                    *Intervenors.*

No. 07-1864

STATE OF NEW YORK; STATE OF
ARIZONA; STATE OF CALIFORNIA;

STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
KENTUCKY; STATE OF NEW
HAMPSHIRE; STATE OF OHIO;
STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF WEST
VIRGINIA; STATE OF WYOMING,

    *Amici Supporting Petitioners.*

MINNESOTA PUBLIC UTILITIES
COMMISSION,

                *Petitioner,*

      v.

FEDERAL ENERGY REGULATORY
COMMISSION,

              *Respondent,*

SOUTHERN CALIFORNIA EDISON
COMPANY; ALLEGHENY POWER;
TRANS-ALLEGHENY INTERSTATE LINE
COMPANY; EDISON ELECTRIC
INSTITUTE; AMERICAN PUBLIC POWER
ASSOCIATION; NATIONAL RURAL
ELECTRIC COOPERATIVE
ASSOCIATION; AMERICAN WIND
ENERGY ASSOCIATION; SAN DIEGO
GAS & ELECTRIC COMPANY; PPL
ELECTRIC UTILITIES CORPORATION,

              *Intervenors.*

                    No. 07-1865

STATE OF NEW YORK; STATE OF
ARIZONA; STATE OF CALIFORNIA;

STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
KENTUCKY; STATE OF NEW
HAMPSHIRE; STATE OF OHIO;
STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF WEST
VIRGINIA; STATE OF WYOMING,
          *Amici Supporting Petitioner.*

COMMUNITIES AGAINST REGIONAL
INTERCONNECT,
                    *Petitioner,*

          v.

FEDERAL ENERGY REGULATORY
COMMISSION,
                    *Respondent,*

ALLEGHENY POWER; TRANS-
ALLEGHENY INTERSTATE LINE
COMPANY; EDISON ELECTRIC
INSTITUTE; AMERICAN PUBLIC POWER
ASSOCIATION; NATIONAL RURAL
ELECTRIC COOPERATIVE
ASSOCIATION; AMERICAN WIND
ENERGY ASSOCIATION; SAN DIEGO
GAS & ELECTRIC COMPANY; PPL
ELECTRIC UTILITIES CORPORATION,
                    *Intervenors.*

No. 07-1866

STATE OF NEW YORK; STATE OF
ARIZONA; STATE OF CALIFORNIA;

STATE OF CONNECTICUT; STATE OF
DELAWARE; STATE OF ILLINOIS;
STATE OF IOWA; STATE OF
KENTUCKY; STATE OF NEW
HAMPSHIRE; STATE OF OHIO;
STATE OF PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF WEST
VIRGINIA; STATE OF WYOMING,
        *Amici Supporting Petitioner.*

On Petition for Review of an Order of
the Federal Energy Regulatory Commission.
(RM06-12-001)

Argued: September 24, 2008

Decided: February 18, 2009

Before MICHAEL and TRAXLER, Circuit Judges, and
Richard L. VOORHEES, United States District Judge for
the Western District of North Carolina, sitting by
designation.

Reversed in part, affirmed in part, vacated in part, dismissed
in part without prejudice, and remanded by published opinion.
Judge Michael wrote the opinion, in which Judge Voorhees
joined. Judge Traxler wrote a separate opinion concurring in
part and dissenting in part.

**COUNSEL**

**ARGUED**: Jonathan D. Feinberg, NYS PUBLIC SERVICE
COMMISSION, Albany, New York; Belina Anderson, GIL-

BERTI, STINZIANO, HEINTZ & SMITH, P.C., New York, New York, for Petitioners. Robert Harris Solomon, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent. Brian R. Gish, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Intervenors. **ON BRIEF:** John W. Montgomery, Jr., MONTGOMERY & SIMPSON, L.L.P., Richmond, Virginia, for Petitioner Piedmont Environmental Council; Peter McGowan, Acting General Counsel to the Public Service Commission of the State of New York, Sean Mullany, Assistant Counsel, NYS PUBLIC SERVICE COMMISSION, Albany, New York, for Petitioners Public Service Commission of the State of New York (NYPSC) and People of the State of New York; Lori Swanson, Attorney General, Kari Zipko, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Petitioner Minnesota Public Utilities Commission. Kevin C. Murphy, Brenda D. Colella, GILBERTI, STINZIANO, HEINTZ & SMITH, P.C., Syracuse, New York, for Petitioner Communities Against Regional Interconnect. Cynthia A. Marlette, General Counsel, Lona T. Perry, Senior Attorney, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent. Barbara D. Underwood, Solicitor General, Benjamin N. Gutman, Deputy Solicitor General, Denise A. Hartman, Assistant Solicitor General, Maureen F. Leary, Assistant Attorney General of Counsel, Lisa M. Burianek, Assistant Attorney General of Counsel, Andrew M. Cuomo, Attorney General of the State of New York, Albany, New York; Terry Goddard, Attorney General of the State of Arizona, Phoenix, Arizona; Christopher Kempley, Chief Counsel, Janice Alward, Keith Layton, Arizona Corporation Commission, Phoenix, Arizona; Edmund G. Brown, Jr., Attorney General of the State of California, Tim Patterson, Deputy Attorney General, San Diego, California; Richard Blumenthal, Attorney General of the State of Connecticut, Michael Wertheimer, Kimberly P. Massicotte, Hartford, Connecticut; Joseph R. Biden, III, Attorney General of the State of Delaware, Kevin

P. Maloney, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware; Lisa Madigan, Attorney General of the State of Illinois, Jane Elinor Notz, Deputy Solicitor General, Chicago, Illinois; Tom Miller, Attorney General of the State of Iowa, Eric J. Tabor, Chief of Staff, Iowa Attorney General's Office, Des Moines, Iowa; Gregory D. Stumbo, Attorney General of the Commonwealth of Kentucky, Douglas Scott Porter, Assistant Attorney General, Frankfort, Kentucky; Catherine Cortes Masto, Attorney General of the State of Nevada, James T. Spencer, Chief Deputy Attorney General, Carson City, Nevada; Kelly A. Ayotte, Attorney General of the State of New Hampshire, Concord, New Hampshire; Marc Dann, Attorney General of the State of Ohio, Benjamin C. Mizer, Deputy Solicitor General, Columbus, Ohio; Hardy Myers, Attorney General of the State of Oregon, Philip Schradle, Special Counsel, Salem, Oregon; Scott Perry, Assistant Counsel, Pennsylvania Department of Environmental Protection, Harrisburg, Pennsylvania; John A. Levin, Assistant Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pennsylvania; Patrick C. Lynch, Attorney General of the State of Rhode Island, Rebecca Tedford Partington, Deputy Chief, Civil Division, Providence, Rhode Island; Darrell V. McGraw, Jr., Attorney General of the State of West Virginia, Fran Hughes, Chief Deputy Attorney General, Office of the Attorney General, Charleston, West Virginia; Bruce A. Salzburg, Attorney General of the State of Wyoming, Cheyenne, Wyoming, for the States of New York, Arizona, California, Connecticut, Delaware, Illinois, Iowa, Kentucky, Nevada, New Hampshire, Ohio, Oregon, Pennsylvania, Rhode Island, West Virginia, and Wyoming, Amici Supporting Petitioners. Daniel M. Adamson, DAVIS, WRIGHT & TREMAINE, L.L.P., Washington, D.C., for Intervenors Edison Electric Institute, American Public Power Association, National Rural Electric Cooperative Association, American Wind Energy Association, and San Diego Gas & Electric Company; Edward H. Comer, Vice President and General Counsel, Henri D. Bartholomot, Director, Regulatory

Legal Issues, EDISON ELECTRIC INSTITUTE, Washington, D.C., for Intervenor Edison Electric Institute; Susan N. Kelly, Vice President of Policy Analysis and General Counsel, AMERICAN PUBLIC POWER ASSOCIATION, Washington, D.C., for Intervenor American Public Power Association; Robert E. Gramlich, Policy Director, AMERICAN WIND ENERGY ASSOCIATION, Washington, D.C., for Intervenor American Wind Energy Association; Wallace Tillman, Vice President and General Counsel, Richard Meyer, Senior Regulatory Counsel, NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION, Arlington, Virginia, for Intervenor National Rural Electric Cooperative Association; E. Gregory Barnes, SAN DIEGO GAS & ELECTRIC COMPANY, San Diego, California, for Intervenor San Diego Gas & Electric Company; Anna J. Valdberg, SOUTHERN CALIFORNIA EDISON COMPANY, Rosemead, California, Alice E. Loughram, Jennifer L. Key, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Intervenor Southern California Edison Company; Donald A. Kaplan, John L. Longstreth, William M. Keyser, III, KIRKPATRICK & LOCKHART PRESTON GATES ELLIS, L.L.P., Washington, D.C., for Intervenor PPL Electric Utilities Corporation; Tegan M. Flynn, Stephen Angle, Andrew N. Beach, VINSON & ELKINS, Washington, D.C., for Intervenors Allegheny Power and Trans-Allegheny Interstate Line Company.

---

**OPINION**

MICHAEL, Circuit Judge:

Two state utilities commissions and two community interest organizations petition for review of several rulemaking decisions made by the Federal Energy Regulatory Commission (FERC or the Commission) in connection with FERC's implementation of the new § 216 of the Federal Power Act (FPA) and the National Environmental Policy Act (NEPA).

Section 216 of the FPA, which was added in 2005, gives FERC jurisdiction in certain circumstances to issue permits for the construction or modification of electric transmission facilities in areas designated as national interest corridors by the Secretary of Energy.

Our decision is as follows. First, we reverse FERC's expansive interpretation of the language in FPA § 216(b)(1)(C)(i) that grants FERC permitting jurisdiction when a state commission has "withheld approval [of a permit application] for more than 1 year." The phrase does not include, as FERC held, the denial of an application. Second, we affirm FERC's determination that it was not required to prepare an environmental assessment or an environmental impact statement in connection with its issuance of procedural regulations dealing with the content of permit applications under § 216 of the FPA. Third, we conclude that FERC violated Council on Environmental Quality (CEQ) regulations when it failed to consult with the CEQ before amending its (FERC's) NEPA-implementing regulations to cover § 216 permit applications. We therefore vacate the amendments to the NEPA regulations and remand for FERC to engage in the required consultation with the CEQ. And fourth, we dismiss without prejudice, because it is not ripe, the part of one petition for review that seeks to challenge the content of the amendments (which we are vacating) to FERC's NEPA-implementing regulations.

I.

The states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities. As a result, the nation's transmission grid is an interconnected patchwork of state-authorized facilities. In recent times increasing concerns have been expressed about the capacity and reliability of the grid. Congress has reacted to these concerns by adding a new section (§ 216) to the FPA when it passed the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005).

FPA § 216 authorizes the Secretary of Energy to designate areas with electric transmission constraints affecting consumers as national interest electric transmission corridors. 16 U.S.C. § 824p(a).[1] Section 216 gives FERC the authority in national interest corridors to issue permits for the construction or modification of transmission facilities in certain instances, including the one at issue here: when a state entity with authority to approve the siting of facilities has "withheld approval for more than 1 year after the filing of an application" for a permit. *Id.* §§ 824p(b), 824p(b)(1)(C)(i).

FPA § 216(c)(2) directed FERC to issue rules specifying the form of, and the information to be contained in, an application for construction or modification of electric transmission facilities in a national interest corridor. *Id.* § 824p(c)(2). On June 26, 2006, FERC issued a notice of proposed rulemaking, proposing regulations to fulfill this statutory requirement. Regulations for Filing Applications for Permits to Site Interstate Electric Transmission Corridors, 71 Fed. Reg. 36,258 (June 16, 2006) (Notice of Proposed Rulemaking). The notice also included proposed amendments to FERC's regulations implementing its responsibilities under NEPA with respect to the siting of electric transmission facilities.

In response to FERC's proposed rulemaking, petitioner Communities Against Regional Interconnect (CARI) and others submitted comments requesting that the Commission confirm that § 216(b)(1)(C)(i)'s phrase "withheld approval for more than 1 year" does not include a state's outright denial of a permit application within the one-year deadline. CARI also commented that certain of the proposed amendments to the regulations implementing NEPA unduly restricted application requirements for the evaluation of the environmental impacts of a proposed project. According to CARI, the amendments, among other things, did not require an adequate assessment of

---

[1]When citations to the new section are required, we will refer to the U.S. Code instead of the FPA.

land use and socioeconomic impacts or sufficient consideration of non-transmission alternatives. On November 16, 2006, FERC issued its final rule, which contained the Commission's substantive interpretation of § 216(b)(1)(C)(i)'s phrase "withheld approval for more than 1 year." Regulations for Filing Applications for Permits to Site Interstate Electric Transmission Facilities, 71 Fed. Reg. 69,440 (Dec. 1, 2006) (Final Rule). FERC interpreted the phrase to include a state's *denial* of a permit within the one-year statutory time frame. In dissenting in part, Commissioner Kelly concluded that the majority's interpretation was contrary to the plain language of the statute. *Id.* at 69,476 (Comm'r Kelly, dissenting). The final rule also contained the regulations governing permit applications under § 216(b) of the FPA and implementing NEPA with respect to § 216(b) applications.

In mid-December 2006 the four petitioners in this proceeding—Piedmont Environmental Council (Piedmont), the Public Service Commission of the State of New York (NYPSC), the Minnesota Public Utilities Commission (Minnesota PUC), and CARI—filed requests for rehearing on FERC's final rule. All argued to FERC that it had erred in holding that § 216(b)(1)(C)(i)'s phrase "withheld approval [of an application] for more than 1 year" includes a denial. Petitioner CARI raised additional challenges in its rehearing request, contending that FERC (1) violated NEPA by issuing the final rule without preparing an environmental assessment or an environmental impact statement; (2) erred in revising its NEPA-implementing regulations without first consulting with the CEQ; and (3) arbitrarily and capriciously issued regulations that unduly restrict application requirements for the evaluation of a proposed project's environmental impacts, particularly in the areas of land use, socioeconomics, and the assessment of non-transmission alternatives. On May 17, 2007, FERC issued an order denying rehearing. Regulations for Filing Applications for Permits to Site Interstate Electric Transmission Facilities, 119 FERC ¶ 61,154 (2007) (Order Denying Rehearing). The Commission rejected the petition-

ers' arguments about the meaning of § 216(b)(1)(C)(i), saying that it "continue[d] to believe that a reasonable interpretation of the language of the legislation support[ed]" its earlier conclusion. *Id.* at 61,979. Commissioner Kelly again dissented on this issue. *Id.* at 61,988. The Commission also rejected CARI's additional arguments. First, FERC said that consultation with CEQ about the amendments to the Commission's NEPA regulations was not necessary because it was simply developing regulations to implement the FPA, not NEPA. Second, FERC concluded that no environmental assessment or impact statement was required in connection with the issuance of the final rule because the new regulations are procedural in nature, that is, they deal with notice and filing requirements for permit applications. Moreover, FERC noted that the regulations themselves do not authorize any construction. Third, FERC addressed CARI's argument that the NEPA-implementing regulations arbitrarily and capriciously restrict application requirements for the evaluation of land use impacts, socioeconomic impacts, and non-transmission alternatives. The Commission said that its regulations in these areas set forth only the minimum initial information required for filing an application; the regulations do not limit the environmental analysis that might be required with respect to a particular project proposal.

Piedmont filed in this circuit a petition for review of FERC's final rule and its order denying rehearing. Thereafter, petitions for review of the final rule and order were filed by the NYPSC in the Second Circuit, by the Minnesota PUC in the D.C. Circuit, and by CARI in the D.C. Circuit. The petitions filed in the Second and D.C. Circuits were transferred to this circuit and thereafter consolidated with the Piedmont petition. All petitioners challenge FERC's interpretation of § 216(b)(1)(C)(i). In addition, CARI challenges (1) FERC's failure to prepare an environmental assessment or impact statement before issuing its final rule, (2) FERC's failure to consult the CEQ before revising its NEPA regulations, and (3) FERC's restriction, in the revised NEPA regulations, of the

environmental impacts and project alternatives permit applicants are required to evaluate.

## II.

Section 216(b)(1)(C)(i) of the FPA grants FERC the authority to issue permits for the construction or modification of electric transmission facilities in national interest corridors when a state commission has "withheld approval for more than 1 year after the filing of an application." 16 U.S.C. § 824p(b)(1)(C)(i). The petitioners challenge FERC's broad interpretation of this jurisdiction-granting provision.

## A.

The petitioners argue that because the authority to site transmission facilities has traditionally been left to the states, we must apply the presumption against preemption in construing § 216(b)(1)'s grant of siting jurisdiction to FERC. This presumption "start[s] with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985) (internal quotation marks omitted). The Supreme Court made clear, however, in *New York v. FERC*, 535 U.S. 1 (2002), that the presumption against preemption does not apply in a case like the one before us today. *New York* held that when Congress has conferred authority upon a federal agency to act in an area of preexisting state regulation, and there is simply a question about the scope of that authority, "we must interpret the statute to determine whether Congress has given [the agency] the power to act as it has, and we do so without any presumption one way or the other." 535 U.S. at 18.

We will therefore review FERC's construction of § 216(b) of the FPA without applying any presumption, and our review will be guided by *Chevron U.S.A. v. Natural Resources*

*Defense Council*, 467 U.S. 837 (1984). Under *Chevron* we first determine whether Congress has "directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." 467 U.S. at 842. On the other hand, if we conclude that "the statute is silent or ambiguous with respect to the specific [question]," we then determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In determining "[t]he plainness or ambiguity of statutory language," we refer "to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

B.

FERC interprets § 216(b)(1)(C)(i)'s phrase "withheld approval for more than 1 year after the filing of [a permit] application" to include a state's outright denial of an application within one year. We conclude that FERC's interpretation is contrary to the plain meaning of the statute. Simply put, the statute does not give FERC permitting authority when a state has affirmatively denied a permit application within the one-year deadline.

We begin with the word "withhold," which means "to hold back : keep from action" or "to desist or refrain from granting, giving, or allowing." Webster's Third New Int'l Dictionary (Webster's) 2627 (2002). We must, of course, consider the word "withheld" in the context of the statutory phrase in which it is used — "withheld approval for more than 1 year." The phrase, read as a whole, means that action has been held back *continuously* over a period of time (more than one year). The continuous act of withholding approval for more than a year cannot include the finite act of denying an application within the one-year deadline. The denial of an application is a final act that stops the running of time during which approval was withheld on a pending application.

To support its interpretation that withholding approval includes the denial of a permit, FERC relies on the dictionary definition of "deny" and a thesaurus entry under "refusal." Specifically, FERC quotes the following definition of "deny": "to refuse to grant : WITHHOLD." Webster's at 603 (capitalization in original). The thesaurus paragraph for "refusal" that FERC relies upon lists "deny" and "withhold" as synonyms. Roget's International Thesaurus, ¶ 776.4 (4th ed. 1984). The word used in the statute is "withheld," so FERC takes a backward approach to its desired result when it relies on the meaning of a word it wishes to substitute for "withheld." The word "deny" is broad enough to include "withhold" in its definition, but the word "withhold" is not broad enough to include "deny" in its definition. *Compare* Webster's at 603 (definition of deny) *with* Webster's at 2627 (definition of withhold). FERC therefore gets no real support from the dictionary. Moreover, just because "deny" and "withhold" are listed as synonyms does not mean that they are always interchangeable. Certainly they are not interchangeable here.

When FERC substitutes "denied" for "withheld," it ignores the context in which "withheld" is used. With FERC's word substitution the statutory phrase would read "*denied* approval [of an application] for more than 1 year." The substitution renders the entire phrase nonsensical because, in the context of dealing with a permit application, the final nature of "denied" conflicts with the continuing nature of "*for* more than 1 year." FERC would thus change the clear meaning of the provision because the denial of a permit application *within* one year ends the application process, and there is nothing about that terminated process that would continue *for* more than one year.

An examination of § 216(b)(1) as a whole, which is the broader context in which the "withheld approval for more than 1 year" phrase appears, confirms that the phrase does not encompass the denial of a permit. Section 216(b)(1) provides a carefully drawn list of five circumstances when FERC may

preempt a state and issue a permit for the construction or modification of electric transmission facilities in a national interest corridor. They are when: (1) a state in which the transmission facilities are to be constructed or modified does not have the authority to approve the siting, 16 U.S.C. § 824p(1)(A)(i); (2) a state does not have the authority to consider the expected interstate benefits to be achieved by the proposed project, *id.* § 824p(1)(A)(ii); (3) a permit applicant is a transmitting utility under the FPA, but does not qualify for a permit in a particular state because it does not serve end-use customers in that state, *id.* § 824p(1)(B); (4) (the circumstance at issue here) a state commission has withheld approval for more than one year after the filing of an application or the designation of the relevant national interest corridor, whichever is later, *id.* § 824p(1)(C)(i); or (5) a state commission has conditioned its approval in such a manner that the proposed construction or modification is not economically feasible or will not significantly reduce transmission congestion in interstate commerce, *id.* § 824p(b)(1)(C)(ii).

If the circumstance of withholding permit approval is set aside, the remaining four circumstances allow FERC jurisdiction only when a state commission either is unable to act or acts inappropriately by including project-killing conditions in an approved permit. These are limited grants of jurisdiction to FERC, and they indicate that Congress meant for the "withheld [permit] approval" circumstance to be limited as well. FERC's reading of the "withheld approval" circumstance to include denial of a permit renders it completely out of proportion with the four other jurisdiction-granting circumstances in § 216(b)(1). The Commission's reading would mean that Congress has told state commissions that they will lose jurisdiction unless they approve every permit application in a national interest corridor. Under such a reading it would be futile for a state commission to deny a permit based on traditional considerations like cost and benefit, land use and environmental impacts, and health and safety. It would be futile, in other words, for a commission to do its normal work. When

the five circumstances in § 216(b)(1) are considered together, they indicate that Congress intended only a measured, although important, transfer of jurisdiction to FERC. In providing for this measured transfer of jurisdiction, Congress simply makes sure that there is a utility commission available —if not a state commission, then FERC — to make a timely and straightforward decision on every permit application in a national interest corridor. In short, § 216(b)(1), read as a whole, does not indicate that Congress intended to bring about the sweeping transfer of jurisdiction suggested by FERC. Indeed, if Congress had intended to take the monumental step of preempting state jurisdiction *every time* a state commission denies a permit in a national interest corridor, it would surely have said so directly.

FERC argues that its authority under § 216(b)(1)(C)(ii) to take jurisdiction when a state commission approves a permit but imposes project-sinking conditions supports its interpretation of "withheld approval" in § 216(b)(1)(C)(i) as a broad grant of jurisdiction. According to FERC, Congress would not "intentionally *allow* federal intervention in the event of onerous state approvals that scuttle projects in national corridors, and yet intentionally *bar* federal review where the state outright denies the application, achieving the same result." FERC Br. at 22 (emphasis in original). FERC's argument overlooks a crucial difference between the two situations. When a state commission grants approval with project-killing conditions, it misuses its authority, and the state licensing system has failed. On the other hand, when a state commission denies an application outright, it acts with transparency and engages in a legitimate use of its traditional powers. There is thus no logical inconsistency between authorizing FERC to assume jurisdiction in the case of permit approvals with overburdensome conditions but not in the case of outright denials.[2]

---

[2]The dissent is mistaken when it says that § 216(i)'s interstate compact provision supports its interpretation of § 216(b)(1)(C)(i). Section 216(i)

We have analyzed the phrase "withheld approval for more than 1 year." Read by itself, the phrase does not include the outright denial of a permit application within the one-year deadline. We have also considered the phrase in the context of the entire statutory provision in which it appears. A reading of the entire provision reveals that Congress intended to act in a measured way and conferred authority on FERC only when a state commission is unable to act on a permit application in a national interest corridor, fails to act in a timely manner, or acts inappropriately by granting a permit with project-killing conditions. The broader context of § 216(b) thus confirms that the meaning of "withheld approval for more than 1 year" is plain: it means that action on a permit application has been held back continuously for more than one year. The continuous act of withholding approval does not include the final

---

authorizes three or more contiguous states to enter into an interstate compact establishing a regional transmission siting agency. 16 U.S.C. § 824p(i). FERC has "no authority to issue a permit for the construction or modification of an electric transmission facility within a State that is a party to a compact, unless the members of the compact are in disagreement." *Id.* § 824p(i)(4). The dissent contends that if Congress had intended in § 216(b)(1)(C)(i) "to allow a single state to simply veto a transmission facility," there would have been no reason "to provide [in § 216(i)(4)] that states in [interstate] compacts must unanimously oppose the grant of an application to deprive FERC of authority." *Post* at 35. The dissent misreads Congress's intent. The two sections are in harmony, but not in the way the dissent suggests. An interstate compact agency does not lose jurisdiction to FERC when it denies a permit, just as a single state commission does not lose jurisdiction when it denies a permit on a timely basis. In addition, § 216(i) imposes greater limitations on FERC authority than those in § 216(b)(1)(C). FERC cannot step in if an interstate compact agency, acting in conformity with § 216(i), considers an application for more than a year or imposes permit conditions that make a project economically infeasible. *Cf.* 16 U.S.C. §§ 824p(b)(1)(C)(i), (ii). Both § 216(i) and § 216(b)(1) confirm that FERC may take jurisdiction only in limited circumstances. Nothing in § 216(i)'s interstate compact provision suggests that § 216(b)(1)(C)(i) should be read to mean that a state commission must grant a permit application in a national interest corridor or else lose jurisdiction to FERC.

administrative act of denying a permit. Because Congress's intent is clear, our review under *Chevron* proceeds no further. For these reasons, we reverse FERC's interpretation of the phrase "withheld approval for more than 1 year."

III.

Petitioner CARI claims that FERC was required to prepare an environmental assessment (EA) or an environmental impact statement (EIS) when it adopted its regulations detailing the information requirements for permit applications under § 216 of the FPA. NEPA requires federal agencies to prepare an EA or an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). FERC determined that its adoption of the new regulations did not amount to major federal action because the regulations were simply procedural. Thus, according to FERC, neither an EA nor an EIS was required. FERC's determination is reviewed for reasonableness under the circumstances. *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir. 1992).

CEQ regulations implementing NEPA define "major federal action" to include "actions with effects that may be major and which are potentially subject to federal control and responsibility." 40 C.F.R. § 1508.18. According to the regulations, "[f]ederal actions tend to fall within one of the following categories": (1) adoption of official policy (rules, regulations, and interpretations), (2) adoption of formal plans, (3) adoption of programs, and (4) approval of specific projects. *Id.* §1508.18(b). FERC relied on one of its own NEPA-implementing regulations in determining that neither an EA nor an EIS was required in connection with the issuance of the permit application rules. The regulation provides that neither of these statements will be prepared in connection with the "promulgation of rules that are . . . procedural." 18 C.F.R. § 380.4(a)(2)(ii). FERC, of course, emphasizes that it will, at the appropriate time, undertake a full environmental analysis

for every proposed transmission project. CARI argues that project-specific environmental assessments will not be enough. Rather, CARI says, a programmatic EIS is required at this stage.

As the D.C. Circuit has explained, "a programmatic EIS reflects the broad environmental consequences attendant upon a wide-ranging [and systematic] federal program." *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981). The D.C. Circuit suggests two questions that are "helpful in reviewing [a federal agency's] decision not to prepare a programmatic EIS." *Id.* at 889. The questions are: "[1] Could the programmatic EIS be sufficiently forward looking to contribute to the [agency's] basic planning of the overall program? and, [2] Does the [agency] purport to 'segment' the overall program, thereby unreasonably constricting the scope of . . . environmental evaluation?" *Id.* at 889. CEQ regulations provide that a programmatic EIS should be prepared when federal actions are connected or cumulative, 40 C.F.R. § 1508.25(a)(1)-(2), or when actions are similar, and a single statement is the best vehicle for assessing environmental effects, *id.* § 1508.25(a)(3).

With respect to the D.C. Circuit's first question, we conclude that a programmatic EIS could not be sufficiently forward looking to contribute to FERC's basic planning for the overall program, that is, the Commission's permitting program for transmission facilities in national interest corridors. Because permit applications will come from private parties, FERC cannot now identify projects that are likely to be sited and permitted. By the same token, FERC does not have information about the ultimate geographic footprint of the permitting program. Without such information a programmatic EIS would not present a credible forward look and would therefore not be a useful tool for basic program planning. With respect to the D.C. Circuit's second question, we conclude that FERC's rules, which require individual project applications, are not designed to segment the overall program in

order to constrict environmental evaluation. Separate and detailed permit applications for each project should facilitate, not impede, adequate environmental assessment. Moreover, FERC could group individual projects under a single EIS as appropriate.

We turn next to the CEQ regulations that call for a programmatic EIS when federal actions are connected, cumulative, or similar. *See* 40 C.F.R. § 1508.25. First, actions are connected if they "[a]utomatically trigger other actions which may require environmental impact statements." *Id.* § 1508.25(a)(1)(i). FERC's actions in issuing its procedural regulations for permit applications do not automatically trigger any further action by the Commission. Of course, private parties will no doubt file permit applications that conform to the regulations, and FERC may issue permits that require it to prepare EISs. But FERC's issuance of a permit requiring an EIS is not an action that would be triggered automatically by its earlier action of issuing procedural regulations. Actions are also connected if they (1) "[c]annot or will not proceed unless other actions are taken previously or simultaneously" or (2) "are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1)(ii)-(iii). FERC's action in issuing the regulations is an independent action which stands alone and did not depend on any prior or simultaneous action by the Commission. Moreover, the action in issuing the regulations does not share mutual dependence with any larger FERC action that requires an EIS.

Second, cumulative actions are those "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2). The regulations themselves did not authorize a project of any kind and do not authorize any alteration of the natural physical environment. Moreover, FERC has not proposed to issue any specific permit for construction. There are thus no cumulative actions with significant environmental effects.

Third, similar actions are those, "which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together." *Id.* § 1508.25(a)(3). FERC's action in issuing regulations specifying the content of permit applications is not similar to the action of issuing a permit. The former action adopts application procedures while the latter involves the substantive review of the merits and consequences of a specific project proposal.

In sum, the standards and regulations that govern when a programmatic EIS should be issued do not indicate that one was required in this instance.

CARI's further argument that FERC must be required to do an EIS now, lest the Commission shirk its responsibilities later when project-specific EISs are required, is also without merit. Once FERC receives a permit application, it will be required under NEPA to assess the environmental effects of the project. The assessment will likely prompt the preparation of an EIS or an EA. Any deficiencies in project-specific environmental assessments may be challenged at the appropriate time.

As of today, FERC has only promulgated regulations specifying the content of permit applications under § 216(b). This action, as the Commission reasonably determined, is not a major federal action significantly affecting the quality of the human environment. FERC therefore was not required to prepare an EA or an EIS in connection with its issuance of the regulations.[3]

---

[3]Because we have rejected FERC's interpretation of the phrase "withheld approval for more than 1 year," we do not reach CARI's argument that the interpretation itself was a major federal action that required an EIS.

IV.

Petitioner CARI further contends that FERC violated CEQ regulations when it revised its own NEPA-implementing regulations without first consulting with the CEQ. This claim raises a question of law that we review *de novo*. *North Carolina v. Fed. Aviation Admin.*, 957 F.2d 1125, 1128 (4th Cir. 1992).

The CEQ has promulgated regulations to implement the requirements of NEPA. *See* 40 C.F.R. § 1500 *et seq.* These implementing regulations require that "each [federal] agency shall as necessary adopt procedures to supplement [the CEQ's] regulations." *Id.* § 1507.3(a). "Each agency shall consult with the Council [CEQ] while developing its procedures and before publishing them in the Federal Register." *Id.* In addition, "[a]gencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of [NEPA]." *Id.* CEQ regulations are binding on federal agencies. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979); *Sugarloaf Citizens Ass'n*, 959 F.2d at 512 n.3.

FERC's NEPA-implementing regulations, promulgated to supplement those of the CEQ, are found at 18 C.F.R. part 380. When FERC issued its final rule with regulations for filing applications for permits under § 216 of the FPA, the Commission included a number of substantial amendments to its NEPA-implementing regulations. *See* Final Rule, 71 Fed. Reg. at 69,470-75. These amendments include revisions or additions to 18 C.F.R. § 380.3 (adding electric transmission projects to the list of actions for which applicants must submit environmental information); § 380.5 (listing projects that require an environmental assessment); § 380.6 (listing projects, including those involving major electric transmission facilities, that require an environmental impact statement), § 380.8 (making the preparation of environmental documents for electric transmission facilities in national interest corridors

the responsibility of FERC's Office of Energy Projects);
§ 380.10 (allowing motions to intervene by third parties once
an application has been filed); and § 380.15 (detailing siting
and maintenance requirements). The final rule also adds a
new section to FERC's NEPA regulations, § 380.16, which
sets forth the various categories of information that must be
included in the environmental report submitted with an appli-
cation.

FERC argues that the regulations listed above were issued
to implement § 216 of the FPA, not NEPA. This argument has
no support whatsoever; indeed, it is contrary to statements
made by FERC during the rulemaking process. In its notice
of proposed rulemaking, FERC said: "Part 380 [18 C.F.R.] of
the Commission's regulations implements its responsibilities
under NEPA. The Commission proposes to revise those regu-
lations by adding sections dealing with its new responsibilities
with respect to the siting of electric transmission facilities."
Notice of Proposed Rulemaking, 71 Fed. Reg. at 36,265. This
statement by FERC and especially the content of the amend-
ments to 18 C.F.R. part 380 leave no doubt that FERC was
also implementing NEPA, not just § 216 of the FPA, when it
amended its NEPA regulations in the final rule.

FERC argues in the alternative that § 1507.3(a) of the CEQ
regulations only require an agency to consult with the CEQ
when the agency develops its initial NEPA-implementing reg-
ulations. This argument also fails. Under § 1507.3(a) an
agency has a continuing duty to review its procedures (or reg-
ulations) "*and in consultation with the [CEQ] to revise them
as necessary* to ensure full compliance with the purposes and
provisions of [NEPA]." 40 C.F.R. § 1507.3(a). FERC violated
§ 1507.3(a) when it failed to consult with the CEQ before
revising its NEPA regulations in the final rule. We therefore
vacate the amendments to FERC's NEPA regulations, 18
C.F.R. part 380, that are set forth in the final rule. Once FERC
consults with the CEQ, FERC may, if it determines that no
modifications are warranted, enter an order reinstating the

amendments. If, however, the Commission proposes to make modifications after the consultation, it may pursue appropriate rulemaking procedures.

V.

Finally, CARI argues that FERC's amended NEPA regulations arbitrarily and capriciously restrict the environmental impact information that must be submitted in an application for construction of transmission facilities under § 216(b). CARI attacks the amended regulations in four areas.

First, CARI contends that the new provision at 18 C.F.R. § 380.16(j) unduly restricts the evaluation of impacts on land use, recreation, and aesthetics to those within one-quarter mile of the proposed transmission line right-of-way. According to CARI, a fair definition of an overhead transmission line's area of impact should begin with a minimum range of one-half mile and be extended, if appropriate, in specific cases.

Second, CARI contends that new § 380.16(k) of the NEPA regulations unduly restricts the range of non-transmission alternatives that an applicant must consider. The regulation requires "[d]iscuss[ion of] the 'no action' alternative and other alternatives given serious consideration" by the applicant. 18 C.F.R. § 380.16(k)(1). CARI argues that all reasonable alternatives must be examined.

Third, CARI contends that FERC inappropriately eliminated a proposed § 380.16(g)(7), set forth in its notice of proposed rulemaking, that would have required the applicant to undertake a property value analysis for residential properties located adjacent to or abutting the proposed right-of-way. *See* Notice of Proposed Rulemaking, 71 Fed. Reg. at 36,273. This deletion, CARI says, violates CEQ regulations, which require an evaluation of economic or social effects when they are interrelated with the project's effects on the natural or physical environment. *See* 40 C.F.R. § 1508.14.

Fourth, CARI contends that FERC fails to require applicants to evaluate a proposed project's effect on the cost of electricity to the consumer, in violation of 40 C.F.R. § 1508.14, which requires the evaluation of a project's economic effects to the extent they are interrelated with natural or physical effects. According to CARI, the consideration of a project's effect on consumer electricity prices should not be deferred entirely for post-project ratemaking procedures; rather, this important effect should be considered before a project is built.

In part IV, *supra*, we decided to vacate FERC's amendments to its NEPA regulations, which are included in the final rule. Our decision will allow FERC to engage in the required consultation with the CEQ. Until that consultation takes place, and any necessary proceedings before the Commission occur, we will not know the exact content of FERC's amendments to it NEPA regulations. As a result, CARI's specific challenges relating to those amendments are not ripe for consideration and resolution at this time. We will therefore dismiss CARI's petition for review without prejudice insofar as it challenges the content of FERC's amendments to its NEPA regulations.

## VI.

In conclusion, the petitions for review in cases No. 07-1651 (filed by Piedmont), No. 07-1864 (filed by the NYPSC), and No. 07-1865 (filed by the Minnesota PUC) are granted. These petitions challenge FERC's interpretation of the phrase "withheld approval for more than 1 year" in § 216(b)(1)(C)(i) of the FPA. The petition in case No. 07-1866 (filed by CARI) is also granted to the extent it raises this same issue. Here, we reverse FERC's interpretation. The phrase "withheld approval for more than 1 year"—under its plain meaning—does not give FERC jurisdiction under § 216(b)(1) when a state commission denies a permit application for the construction or

modification of electric transmission facilities in a national interest corridor.

The petition for review in No. 07-1866 (filed by CARI) is granted insofar as it challenges FERC's decision not to prepare an environmental assessment or an environmental impact statement before issuing its final rule that includes regulations for filing permit applications under § 216(b). On this issue we affirm FERC's decision not to prepare an EA or an EIS.

The petition for review in No. 07-1866 (filed by CARI) is granted insofar as it challenges FERC's failure to consult with the CEQ before issuing amendments to its (FERC's) regulations implementing NEPA. With respect to this challenge, we hold that consultation was required, and, we therefore vacate the amendments to FERC's NEPA regulations. Consultation may be pursued on remand.

The petition for review in No. 07-1866 (filed by CARI) is dismissed without prejudice insofar as it raises specific challenges to the content of amendments to FERC's NEPA regulations. These challenges are not ripe for consideration.

The cases are remanded to FERC.

*REVERSED IN PART, AFFIRMED IN PART,*
*VACATED IN PART, DISMISSED IN PART*
*WITHOUT PREJUDICE, AND REMANDED*

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts III, IV, and V of the majority opinion (with the exception of footnote 3). However, because I believe that FERC correctly interpreted "withheld approval [of a permit application] for more than 1 year" in 16 U.S.C.A. § 824p(b)(1)(C) (West Supp. 2008) to include the failure or refusal to grant a permit application for more than one year

in cases in which the permit application was denied, I respect-fully dissent from the contrary holding.

I.

A.

Before examining the specific statutory language in ques-tion, I pause briefly to discuss the circumstances that brought about the legislation. Most important among these circum-stances is the shift, since the enactment of the Federal Power Act, in the way that electricity has been produced and deliv-ered to consumers, from it being generated and consumed in the same general geographic area to it being transmitted great distances from the area in which it was generated.

> [U]nlike the local power networks of the past, elec-tricity is now delivered over three major networks, or "grids," in the continental United States . . . . It is only in Hawaii and Alaska and on the "Texas Inter-connect"—which covers most of that State—that electricity is distributed entirely within a single state. In the rest of the country, any electricity that enters the grid immediately becomes part of a vast pool of energy that is constantly moving in interstate com-merce. As a result, it is now possible for power com-panies to transmit electric energy over long distances at a low cost.

*New York v. FERC*, 535 U.S. 1, 7-8 (2002) (footnote omit-ted). A study issued in May 2002 by the Department of Energy noted, however, that construction of new transmission facilities has been unable to keep up with increasing demands for electricity, resulting in transmission bottlenecks that have increased consumer costs as well as the chances of blackouts. *See* U.S. Dep't of Energy, National Transmission Grid Study (May 2002) ("Study"), at xi, 5-6 *available at* http://

www.ferc.gov/industries/electric/gen-info/transmission-grid.pdf. The Study further determined and recommended:

> Rules and regulations that will improve procedures for the siting and permitting of transmission lines should be implemented immediately. The FERC should play a limited role focused on supporting state and regional efforts, but should also possess backstop authority to ensure that transmission facilities that eliminate national interest transmission bottlenecks are sited and constructed. The FERC should act if state and regional bodies are unsuccessful in siting and permitting national interest transmission lines.

Study at 58-59. In this regard, Senate Energy and Natural Resource Committee Chairman Domenici stated on the Senate floor concerning pending legislation that eventually would become the Energy Policy Act of 2005 ("EPAct 2005"), Pub. L. No. 109-58, 119 Stat. 594 (2005):

> To avoid future blackouts and provide our industry and consumers with the reliable electricity they need, we need to invest in critical transmission infrastructure; provide limited Federal siting authority of transmission lines to ensure the transmission of national interest lines, and avoid the most significant areas where we had gridlock; [and] streamline the permitting of siting for transmission lines to assure adequate transmission. . . . We need all these parts of the Energy bill.

150 Cong. Rec. S3732 (daily ed. April 5, 2004) (statement of Sen. Domenici). It was in this context that Congress enacted EPAct 2005.

### B.

I agree for the reason explained by my colleagues that our review of the statutory language at issue must be guided by

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See ante* at 13-14. Under *Chevron*, we must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, we need go no further. *See id.* On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We would not need to conclude that the agency's interpretation is "the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. Rather, to uphold the agency's construction, we need only find that it was "reasonable." *Id.* at 844. In my view, the language of the statute, when considered in the context of the statute's purpose and other provisions in the statute, is susceptible to only one interpretation, the one that FERC adopted.

Section 824p(b) allows FERC, after notice and an opportunity for hearing, to issue permits for construction or modification of electric transmission facilities in areas the Secretary of Energy has designated as national interest electric transmission corridors if it finds that

> (1)(A) a State in which the transmission facilities are to be constructed or modified does not have authority to—
>
>> (i) approve the siting of the facilities; or
>>
>> (ii) consider the interstate benefits expected to be achieved by the proposed construction or modification of transmission facilities in the State;
>
> (B) the applicant for a permit is a transmitting utility under this chapter but does not qualify to apply

for a permit or siting approval for the proposed project in a State because the applicant does not serve end-use customers in the State; or

(C) a State commission or other entity that has authority to approve the siting of the facilities has—

(i) *withheld approval for more than 1 year* after the filing of an application seeking approval pursuant to applicable law or 1 year after the designation of the relevant national interest electric transmission corridor, whichever is later; or

(ii) conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible;

(2) the facilities to be authorized by the permit will be used for the transmission of electric energy in interstate commerce;

(3) the proposed construction or modification is consistent with the public interest;

(4) the proposed construction or modification will significantly reduce transmission congestion in interstate commerce and protects or benefits consumers;

(5) the proposed construction or modification is consistent with sound national energy policy and will enhance energy independence; and

(6) the proposed modification will maximize, to the extent reasonable and economical, the transmission capabilities of existing towers or structures.

16 U.S.C.A. § 824p(b) (emphasis added).

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). We begin with the statutory text. *See Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 254 (4th Cir. 2007). "In the absence of a definition from Congress in a statute, or a clear congressional intent to the contrary, we accord words in a statute their ordinary, contemporary, common meaning." *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 345 (4th Cir. 2008) (citation & internal quotation marks omitted). Applying the common meaning of the word "withhold" yields a straightforward rule that a state has "withheld approval for more than 1 year" when one year after approval has been sought, the state still has not granted it, regardless of the reason. *See Funk & Wagnalls Standard Dictionary* 936 (1980) (defining "withhold" in part as "[t]o keep back; decline to grant"). Indeed, this is the construction that FERC adopted.

Despite the apparent clarity of the words "withhold" and "approval," Petitioners maintain that even if a state has not granted approval more than a year after an application has been submitted, it has not "withheld approval for more than 1 year" if it has affirmatively denied the application. Petitioners argue that denying approval cannot constitute "withh[olding] approval" because a denial is a discrete event and it therefore makes no sense to speak of "denying approval for more than 1 year."

In my opinion, this argument is not sound. Under FERC's interpretation, the discrete event of denial does not *constitute* the withholding of approval that extends for more than one year after the application is received. The denial is merely one event that may occur during the more-than-one-year period in which approval is withheld. Under the common meaning of the words "withhold" and "approval," approval is withheld,

*i.e.*, not granted, every day that no decision is issued granting approval, and it continues to be withheld on the day an application is denied (as well as every day that such a denial is not reconsidered). Thus, if a state denies an application, and then, ten months after submission of the application, reverses course and grants the application, it would certainly be the case that the state "withheld approval" for ten months before granting it. Similarly, if one year and one day after submission of an application a state has denied an application (and not reconsidered its decision), it has "withheld approval for more than 1 year." There is no other reasonable way to interpret those words.[1]

Not surprisingly, an examination of the context in which these words are used and the context of the statute as a whole confirms that Congress meant its words to be given their common meaning. First and foremost is the subsection directly following 16 U.S.C.A. § 824p(b)(1)(C)(i), which gives FERC authority when a state has granted approval but "conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission

---

[1]Petitioners contend that had Congress intended that a state could have "withheld approval for more than 1 year" in a case in which the application was denied during the one-year period, it could have conveyed that notion more clearly had it substituted "denied an application or failed to act for more than one year," for "withheld approval." Petitioners note that Congress actually employed such language in another part of the statute, *see* 16 U.S.C.A. § 824p(h)(6)(A) (West Supp. 2008) ("If any agency has denied a Federal authorization required for a transmission facility, or has failed to act by the deadline established . . ."), and Petitioners suggest that its decision not to do so here creates some doubt as to what Congress intended. Petitioners' point might have some force if the language Congress did choose were reasonably susceptible to more than one meaning, but it is not, as I have explained. Moreover, had Congress simply meant "failed to act on an application for more than 1 year," and not meant the statute to include outright denials, it could easily have used words that actually had that meaning, as it did in another part of EPAct 2005. *See* 16 U.S.C.A. § 824b(a)(5) (West Supp. 2008) ("If the Commission does not act within 180 days [on an application] . . .").

congestion in interstate commerce or is not economically feasible." 16 U.S.C.A. § 824p(b)(1)(C)(ii). Read together, the two subsections provide that while a state has a full year to consider and act on an application without interference from FERC, FERC nevertheless has the authority to ensure that a state does not frustrate the goal of significantly reducing transmission congestion in a national interest corridor. Petitioners, however, suggest that Congress did not intend to essentially "trump" the states' permitting decisions in order to accomplish this goal. That suggestion is completely belied, however, by *Congress's undisputed willingness to do just that when a state grants a permit under conditions FERC determines to be unreasonable. See* 16 U.S.C.A. § 824p(b)(1)(C)(ii). The notion that Congress would have been willing to "trump" states when they thwart the goal of significantly reducing transmission congestion in a national interest corridor by granting permits subject to conditions FERC determines to be unreasonable but would not be willing to do so when states thwart the same goal by denying the permits outright makes no sense to me in light of the purpose of the legislation.

The argument that Petitioners' interpretation can be squared with § 824p(b)(1)(C)(ii) because "[w]hen a state commission grants approval with project-killing conditions, it misuses its authority, and the state licensing system has failed," but when a state simply denies an application, it "acts with transparency and engages in a legitimate use of its traditional powers," *ante* at 17, is not correct in my view. With all due respect, such a misuse of authority would occur only if a state granted its approval with conditions that it imposed *for the purpose of* killing the project. Section 824p(b)(1)(C)(ii) is not so narrow as to limit FERC's jurisdiction to cases in which such intentionally deceptive action has occurred. Rather, it clearly allows FERC to exercise jurisdiction based

on simple differences of opinion between FERC and the state regarding the impact of the conditions imposed.[2]

Nor can I square 16 U.S.C.A. § 824p(i) (West Supp. 2008) with Petitioners' suggestion that Congress intended to allow a single state to impede Congress's goal of reducing transmission congestion in national interest electric transmission corridors by simply denying an application outright. That subsection allows three or more contiguous states to enter into an interstate compact, subject to Congress's approval. States that have entered into such compacts are authorized to establish regional transmission siting agencies that can facilitate siting of electric transmission facilities within those states and carry out their siting responsibilities. FERC has no authority to issue permits for construction or modification of electric transmission facilities within such states so long as all states in the compact agree that the permit should not be issued. *See* 16 U.S.C.A. § 824p(i)(4). Had Congress been inclined to allow a single state to simply veto a transmission facility for purely local reasons—as it could do under Petitioners' construction—there would have been no reason to provide for these interstate compacts or to provide that states in such compacts must unanimously oppose the grant of an application to deprive FERC of authority.

I recognize that several states participating in this appeal as amici curiae contend that FERC's interpretation would render the states' consideration of applications irrelevant. Even if the contention were true, it would not create an ambiguity in the statute, especially considering the critical national energy interests that Congress sought to protect with this legislation. FERC brings a broader national perspective to siting propos-

---

[2]For the same reason, in my view, the conclusion that the four circumstances other than § 824p(b)(1)(C)(i) "allow FERC jurisdiction only when a state commission either is unable to act or acts *inappropriately*," *ante* at 16 (emphasis added), is not correct with respect to § 824p(b)(1)(C)(ii) if "inappropriately" refers to a misuse of authority.

als in national interest electric transmission corridors than individual states possess, and Congress clearly intended that FERC would be authorized to act from that perspective. Nevertheless, the contention that FERC's interpretation makes the states' permitting decisions irrelevant is not correct. FERC has explained that it takes into consideration a state's decision in making its own permitting determinations. Furthermore, a state has the authority to impose on any grant of an application conditions that FERC is powerless to overturn so long as the conditions are economically feasible and would not prevent the significant reduction of transmission congestion in interstate commerce. *See* 16 U.S.C.A. § 824p(b)(1)(C)(ii). By considering the states' decisions and allowing states to impose reasonable conditions upon application grants, FERC can pursue important national energy interests while at the same time respecting, to some degree, the interests and judgments of the states. Thus, FERC's interpretation is strongly supported by the framework of the statutory scheme as a whole.

C.

Although it is not determinative, it is nonetheless worth noting that FERC's construction, which I believe to be the only plausible reading of the statute, is also buttressed by the applicable legislative history. The plainest statements from the House of Representatives are from the House Committee Report on bill H.R. 1640, which contained language identical to the bill the President eventually signed, H.R. 6. The House Report described the bill as allowing FERC authority "if, after one year, a state, or other approval authority is unable or refuses to site the line." H.R. Rep. No. 109-215(I), at 261 (2005). Indeed, the House Report also contains "Dissenting Views" of members who understood the bill to have the very same meaning. *See id.* at 494 (noting that bill would "preempt . . . state decisions about whether new or expanded lines should be built"). At least two congressmen, in discussing the merits of the siting provisions of the bill, recognized the clear import of the language. Representative Dingel stated that it

"eliminates . . . deference to the States in decisions about the siting of electric transmission lines and natural gas facilities," 151 Cong. Rec. H2193 (daily ed. Apr. 20, 2005), and Representative Shays noted that the bill allows FERC "to preempt state siting authorities when it is determined that a high-voltage power line is of 'national significance,'" *id.* at H2196. Similarly, a Senate committee report summarizing a bill, S. 10, that contained relevant language identical to that of § 824p(b)(1)(C)(i), described the bill as "authoriz[ing] FERC to issue siting permits if a State withholds approval *inappropriately*." S. Rep. No. 109-78, at 5 (2005) (emphasis added). The use of the term "inappropriately" strongly suggests that the Committee primarily had in mind situations in which a state denied a permit that was necessary to ensure reliability of the national transmission grid, not simply situations where a state had not ruled on an application for a certain period of time.

Petitioners maintain that FERC's authority in the legislative history is often described as "limited" or "backstop," which they believe indicates that FERC lacks authority when a state denies a permit outright. But that is simply not the case. This characterization merely recognizes what I have already explained—that Congress sought to achieve a balance in giving the states an opportunity to dispose of permit applications without involvement by FERC, by allowing the states to place reasonable conditions on the grant of such permits that could not be overruled, and by allowing them to form compacts of three or more contiguous states whose unanimous denials also could not be overridden. That FERC's authority may be limited does not even suggest that Congress would not have authority to grant applications in some situations in which states had denied them. *See* Study, at 59 ("The FERC should play a limited role focused on supporting state and regional efforts, but should also possess *backstop authority to ensure that transmission facilities that eliminate national interest transmission bottlenecks are sited and constructed*. The FERC should act if state and regional bodies are unsuccessful

in siting and permitting national interest transmission lines.")
(emphasis added).

## II.

In sum, the reasons are numerous for concluding that
§ 824p(b)(1)(C)(i) plainly has the meaning that FERC
adopted. Only FERC's interpretation gives Congress's words
their common meaning, and only FERC's interpretation
makes sense in the context in which the language is used and
in the context of the statute as a whole. Indeed, as I have
explained, that plain meaning is also the one indicated in the
applicable legislative history. Finally, even assuming
*arguendo* that the statute's meaning were not plain, I would
conclude that FERC's interpretation was reasonable at the
very least, and therefore entitled to deference under *Chevron*.
I would therefore affirm FERC's interpretation.[3]

---

[3]Because I would affirm FERC's construction, I would need to address
the claim of Petitioner Communities Against Regional Interconnect that
FERC was required to prepare an environmental assessment ("EA") or an
environmental impact statement ("EIS") when it adopted its interpretation.
I would hold that FERC's decision not to prepare an EA or an EIS was
reasonable. *See Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th
Cir. 1992) (stating standard of review).