\* Edward R. Madigan is substituted for Clayton Yeutter as Secretary of Agriculture pursuant to

 Nor can the district court's award of attorneys' fees to WCT and Local Union 692 be justified on any other ground. In general, determination of the circumstances in which attorneys' fees may be awarded is the exclusive prerogative of Congress. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260–63, 95 S.Ct. 1612, 1623–24, 44 L.Ed.2d 141 (1975). A federal court may, however, award attorneys' fees not only when the common benefit exception applies but also when the case falls within one of the other two longstanding, judicially created exceptions to the general rule against fee-shifting: willful disobedience of a court order and bad faith or abusive litigation. *Id.* at 258–59, 95 S.Ct. at 1622. In the case before us, there is no allegation that Ackley and Cole willfully disobeyed a court order or acted in bad faith. "[T]he federal courts cannot, absent specific statutory authority or one of the three enumerated exceptions listed by the Supreme Court, alter the uniform system of cost-bearing created by Congress, or shift attorneys' fees merely because a party has lost a case or offended some legal norm." *Zambrano v. City of Tustin*, 885 F.2d 1473, 1481 (9th Cir.1989) (footnote and citation omitted). The union defendants' request for attorneys' fees was not within the district court's authority to grant. Accordingly, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

**RIVERBEND FARMS, INC., a California Corporation; Sequoia Orange Co.; Exeter Orange Co., a California Corporation, Plaintiffs–Appellees,**

v.

**Edward R. MADIGAN,\* Secretary Department of Agriculture, Defendant–Appellant.**

Fed.R.App.P. 43(c)(1).

RIVERBEND FARMS, INC., a California Corporation; Sunny Cove Citrus Association, a California cooperative corporation; Belridge Packing Co., a California corporation; Sequoia Orange Company, Inc., a California corporation; and Exeter Orange Company, Inc., a California corporation, Plaintiffs–Appellants,

v.

Edward R. MADIGAN, Secty Dept. of Agriculture, Defendant–Appellee.

Nos. 90–15505, 90–15781.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 1991.

Decided March 17, 1992.

James Moody, Washington, D.C., and Thomas E. Campagne, A Professional Corporation, Fresno, Cal., for plaintiffs-appellees-appellants.

Mark W. Pennack, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant-appellee.

Before CANBY and KOZINSKI, Circuit Judges, and CARROLL,** District Judge.

KOZINSKI, Circuit Judge.

 Procedure, not substance, is what most distinguishes our government from others. In the not-so-distant past, a government agency in the Soviet Union could impose controls on the production of commodities without bothering to involve the public in the decisionmaking process. By contrast, a government agency in the United States must usually give notice to, and accept comments from, the public before undertaking to place manacles on the invisible hand. 5 U.S.C. § 553. In this case, we address some of the details of this notice and comment requirement.

## Background

Plaintiffs are domestic "handlers" of navel oranges: they buy, sell, consign, transport, ship, or by other means place oranges in the current of commerce. 7 C.F.R. § 907.10 (1991). They challenge the procedure used by the Secretary of Agri-

---

** The Honorable Earl H. Carroll, United States District Judge, District of Arizona, sitting by designation.

culture to regulate the navel orange market. Plaintiffs contend that the regulatory system: (1) neither complies with the Administrative Procedure Act's notice and comment requirements nor falls within the good cause exception to those requirements; (2) eviscerates the requirement that the Secretary engage in reasoned decision-making; and (3) denies plaintiffs equity in marketing opportunity.

The Agricultural Marketing Agreement Act, 7 U.S.C. § 601 *et seq.*, authorizes the Secretary of Agriculture to issue marketing orders limiting the quantity of commodities shipped into markets identified by the Secretary, thus protecting prices for producers and maintaining orderly marketing conditions. 7 U.S.C. § 602(1). Pursuant to the AMAA, the Secretary promulgated regulations in 1954 (Marketing Order 907, 7 C.F.R. Part 907) to govern the shipment of navel oranges from California and Arizona.[1] For the most part, the regulations promulgated in this marketing order still govern the navel orange market.

The regulations divide California and Arizona into four districts and authorize the Secretary to limit the quantity of navel oranges shipped from these districts to points in the continental United States or Canada during the navel orange marketing season, which generally runs from the middle of fall until the middle of spring.

Pursuant to the regulations, the Navel Orange Administrative Committee (NOAC), an eleven-member committee composed of ten representatives of growers, handlers or cooperative marketing organizations and one non-industry representative, develops its annual Marketing Policy before the start of each season. *See* 7 C.F.R. §§ 907.-20–.34; *id.* §§ 907.50–.51; Judicial Officer's Opinion, Finding of Fact No. 9(a), at 45–46. As part of this process, the NOAC notifies all handlers by letter and places advertisements in the newspaper before holding a public meeting concerning the proposed Policy. JO, Finding of Fact No. 14(d), at 70. The Policy estimates the weekly volume restrictions that will probably be needed during the upcoming navel orange sea-

son. JO, Finding of Fact No. 9(a), at 46. The Secretary then analyzes the NOAC recommendations in the Policy and issues a Position Paper indicating whether he intends to impose volume restrictions in the forthcoming year and what he intends those restrictions to be for each week during the season. JO, Finding of Fact No. 16, at 71–79.

Each Tuesday during the season, the NOAC holds a meeting to settle on a recommendation to give the Secretary for the following week's volume restrictions. Before each meeting, NOAC members usually notify growers and handlers of navel oranges in order to obtain their general views on market conditions. JO at 190. At the meeting, growers, handlers and any other members of the public may participate. JO, Finding of Fact No. 17, at 79. After the meeting, the NOAC makes a recommendation to the Secretary as to the volume of oranges he should authorize for shipment into the domestic market for the week beginning that Friday. *Id.* After making its recommendation, the NOAC provisionally calculates the quantity of oranges that may be handled by each district, and by each handler within the district, during the coming week, 7 C.F.R. § 907.-54(a), and informs the handlers of their scheduled allotment. The Secretary then issues the actual rule, which seldom varies from the NOAC's recommendation. JO, Finding of Fact No. 20, at 86. The rule is published in the *Federal Register* on Friday and sets the volume restrictions for the upcoming week. When the Secretary issues the rule, he includes a finding that states: "It is further found that it is impracticable and contrary to the public interest to give preliminary notice, engage in public rulemaking, and postpone the effective date until 30 days after publication in the Federal Register." ALJ Decision, Finding of Fact No. 4(c), at 25.

### Discussion

#### I

■ A. The Administrative Procedure Act ensures that the massive federal bu-

---

1. Plaintiffs do not challenge the validity of the marketing order.

reaucracy remains tethered to those it governs—or so the theory goes. When an agency decides to issue a rule, it must first publish a notice of proposed rulemaking in the *Federal Register,* which is the guide for those members of the public—usually special interest groups—who want to participate in the rulemaking process. The notice must contain "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Although the APA mandates no minimum comment period, some window of time, usually thirty days or more, is then allowed for interested parties to comment. *Petry v. Block,* 737 F.2d 1193, 1201 (D.C.Cir.1984). The public may comment "through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). After "consideration of the relevant matter presented," the agency publishes the final rule, accompanied by a "concise general statement of [its] basis and purpose," in the *Register. Id.*

The gestation period from initial notice to final rule can be a couple of months, and often much longer depending on the time the agency allows for comments and the time it takes to digest those comments. In addition to the time required for the notice and comment procedures to run their course, an additional thirty days ordinarily must pass between the time the final rule is published and the time it takes effect. 5 U.S.C. § 553(d).

B. The APA contains a few exceptions to the notice and comment requirements for informal rulemaking. One of these is the good cause exception, which applies when an agency "for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Secretary of Agriculture has relied on this exception for several decades and has never fully complied with the APA's notice and comment requirements before issuing weekly navel orange volume restrictions.

Plaintiffs, currently defendants in forfeiture proceedings for allegedly violating volume restrictions, argue that past volume restrictions are invalid because they were promulgated without observing the APA's notice and comment requirements. Plaintiffs argue that the good cause exception cannot justify the wholesale abandonment of the APA's requirements week in and week out, year in and year out, for the entire life of a regulatory program. The Secretary counters that the regulatory process simply could not be carried out if he were required to follow APA procedures (which often take weeks or months) for rules that must be put into effect almost immediately and that have an effective life of exactly one week. We agree with both parties.

The Secretary certainly has the better of the argument when he points out that he has made a substantive regulatory decision that volume restrictions must be issued on a weekly basis, and that we and plaintiffs are bound by that decision. The APA was intended to impose procedural requirements on the adoption of rules; it is not a device by which an agency may be forced to adopt a less effective regulatory program in order to more effectively comply with notice and comment procedures. The existence of the good cause exception is proof that Congress intended to let agencies depart from normal APA procedures where compliance would jeopardize their assigned missions. *Levesque v. Block,* 723 F.2d 175, 184 (1st Cir.1983).[2]

**2.** Under the good cause exception, notice and opportunity for comment is not required when doing so would be: (1) impracticable; (2) unnecessary; or (3) contrary to the public interest. Notice and comment is "impracticable" when the agency cannot "both follow section 553 and execute its statutory duties." *Levesque,* 723 F.2d at 184. Notice and comment is "unnecessary" when "the regulation is technical or minor." *Id.* Furthermore, "contrary to the public interest" supplements these terms and "requires that public rule-making procedures shall not prevent an agency from operating." *Id.* (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprint-*

■ At the same time, the good cause exception goes only as far as its name implies: It authorizes departures from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission. The agency thus must minimize conflict with the APA by complying with those APA requirements it is capable of complying with.

The procedures the Secretary has adopted do not, in fact, depart radically from those contemplated by the APA. Most significant is the fact that the Secretary gives interested parties an opportunity to appear and have their say at the weekly NOAC meetings, and that such input is received and considered by the NOAC in making its recommendation to the Secretary. The procedure departs from normal APA practice in only three respects: First, the Secretary does not publish a *Federal Register* notice of the proposed weekly volume restriction, which would advise the public that it could comment at the NOAC meeting to be held the Tuesday before the week in question. Second, there appears to be no opportunity for written comments— or indeed any comments other than by persons attending the NOAC meetings. Finally, the volume restrictions go into effect immediately, bypassing the normal 30–day delay in the effective date of a final rule.

■ The last of these departures is the easiest to justify. To analyze it, we must first recognize that the APA contains two good cause exceptions: One, as we have noted, excuses failure to abide by the notice and comment requirements, and the other allows an agency to forego the 30–day waiting period between publication of the final rule and its effective date. *See* 5 U.S.C. § 553(b)(B) & (d)(3). Although some courts have failed to distinguish the two

good cause exceptions, commentators and some courts have correctly recognized that different policies underlie the exceptions, and that they can be invoked for different reasons. *See U.S. Steel Corp. v. EPA*, 605 F.2d 283, 289–90 (7th Cir.1979) (good cause more easily found as to 30–day waiting period), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); Comment, 1980 B.Y.U.L.Rev., at 97 (30–day waiting period "in no way relates to the notice and comment requirement, but the federal courts have not always been careful to maintain the distinction"); G. Edles & J. Nelson, *Federal Regulatory Process: Agency Practices and Procedures* § 4.2.III, at 68 (2d ed. 1991) (two good cause exceptions are "conceptually different").

■ Unlike the notice and comment requirements, which are designed to ensure public participation in rulemaking, the 30–day waiting period is intended to give affected parties time to adjust their behavior before the final rule takes effect. This is sensible; until the final rule is published, the public is not sure of what the rule will be or when the rule will actually be promulgated. In addition, a window of time usually causes no harm.

■ Neither of these reasons for the waiting period is applicable to the navel orange regulatory system. The public knows the rule will take effect on Friday of the week in question and is given accurate, advance notice of what the rule is likely to be. *See* JO, Finding of Fact No. 18, at 83.[3] More importantly, requiring this 30–day waiting period would cause great harm: It would force the Secretary to predict weekly volume restrictions more than thirty days in advance. The record convincingly estab-

---

ed in Senate Judiciary Committee, 79th Cong., 2d Sess., Administrative Procedure Act Legislative History 185, 200 (1946)). *See generally* Jordan, *The Administrative Procedure Act's "Good Cause" Exemption*, 36 Admin.L.Rev. 113, 120–52 (1984); Comment, *Agency Discretion to Accept Comment in Informal Rulemaking: What Constitutes "Good Cause" Under the Administrative Procedure Act?*, 1980 B.Y.U.L.Rev. 93, 100–01.

　　Emergencies, though not the only situations constituting good cause, are the most common.

*See Northern Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir.1987); *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir.1982).

**3.** The NOAC notifies handlers on Tuesday of its recommendation to the Secretary, and the Secretary has accepted this recommendation without change over 90% of the time. JO, Finding of Fact No. 18, at 83.

lishes the impossibility of accomplishing that feat with any degree of accuracy: The NOAC is constantly revising projections right up until, and occasionally even during, the week in question. *See* JO, Finding of Fact No. 12(a), at 60; *id.* No. 13(a), at 67; *id.* No. 18, at 83. We cannot impose a 30–day waiting period, in essence requiring the Secretary to predict market and weather conditions more than a month in advance, without throwing the entire regulatory program out of kilter. We therefore hold that the Secretary has shown good cause for making the weekly restriction effective upon publication in the *Federal Register.*

■■■■■ More problematic are the Secretary's other two deviations from normal APA procedures. While the Secretary argues persuasively that interested parties have actual notice of the weekly meetings, such notice is defective in two ways. First, the APA contemplates notice to all members of the public—regardless of whether individual members have a particularized interest in the regulatory program—by means of publication in the *Federal Register.* While *Federal Register* publication may be unnecessary or duplicative in some, if not many, cases, its prophylactic effect ensures that agencies and reviewing courts need not make the difficult and necessarily ad hoc determinations of who has a sufficient interest (i.e., would they comment if given notice?) in a proposed rule. Second, any notice given to interested parties does not contain anything akin to a proposed rule: The Secretary gives no indication of the proposed volume restriction for that

week. It is a fundamental tenet of the APA that the public must be given some indication of what the agency proposes to do so that it might offer meaningful comment thereon. 5 U.S.C. § 553(b)(3); K. Davis, 1 *Administrative Law Treatise* § 6.25, at 571 (2d ed. 1978).

■■■■ The Secretary has not demonstrated that it would be impracticable to publish a notice in the *Federal Register* a few days before the NOAC meeting, advising the public of the time and place of the meeting, the legal authority for the proposed volume restrictions [4] and the proposed volume restrictions.[5] The Secretary would not, of course, be bound by a proposed volume restriction—the purpose of notice and comment is to help the agency make an informed decision—but the agency would be required to give its best estimate based on the available information at the time the notice is published.[6]

The third deviation from the APA's normal practice is as troubling as the second: The Secretary allows only *oral* comments from those who attend the NOAC meetings. There may be persons interested in the navel orange market who are unable to attend, or have a representative attend, the weekly NOAC meeting, yet the Secretary has suggested no reason why he cannot accommodate the normal APA procedure of allowing the submission of written comments before promulgating weekly volume restrictions. It's clear that given even a few days' notice, members of the public would have sufficient opportunity to submit written comments to the NOAC before the weekly meeting.

---

**4.** This, of course, would simply require brief reference to the AMAA and Marketing Order 907.

**5.** Given that the Secretary's annual position paper sets forth the planned weekly volume restrictions, the Secretary cannot seriously contend that it would be impracticable to include proposed figures in the notice. If, at the time the notice is published, it's too early to tell what the actual figures might be, the Secretary can say so in the notice and replicate the figures

that were allotted for the week in question in the position paper.

**6.** There is no requirement that the rule contained in the notice of proposed rulemaking be the same as the final rule: "Parties have no right to insist that a rule remain frozen in its vestigial form." *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974); *see also AFL–CIO v. Donovan,* 757 F.2d 330, 338 (D.C.Cir. 1985) ("It is, of course, elementary that a final rule need not be identical to the original proposed rule.").

We thus conclude that the Secretary's rulemaking fails to satisfy the APA's requirements because he has not demonstrated good cause for failing to give sufficient notice in the *Federal Register* of the weekly NOAC meeting and failing to allow the public to comment by means other than personal participation at the NOAC meeting.

This conclusion, though important for how the Secretary must regulate the navel orange markets in the future, does not answer the question of most concern to the parties in this case: the remedy. We must decide what effect the Secretary's failure to comply with notice and comment requirements carries for past weekly volume restrictions. If we invalidate past volume restrictions, plaintiffs would obviously succeed in the pending forfeiture proceedings brought against them by the Secretary. It's to that question we now turn.

■■■■ C. The APA requires that we take "due account" of the harmless error rule. *See* 5 U.S.C. § 706. It's true, as plaintiffs argue, that we must exercise great caution in applying the harmless error rule in the administrative rulemaking context. The reason is apparent: Harmless error is more readily abused there than in the civil or criminal trial context. An agency is not required to adopt a rule that conforms in any way to the comments presented to it. So long as it explains its reasons, it may adopt a rule that all commentators think is stupid or unnecessary. Thus, if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures. To avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must therefore focus on the process as well as the result. We have held that the fail-

ure to provide notice and comment is harmless only where the agency's mistake "clearly had no bearing on the procedure used or the substance of decision reached." *Sagebrush Rebellion, Inc. v. Hodel,* 790 F.2d 760, 764–65 (9th Cir.1986) (quoting *Braniff Airways v. CAB,* 379 F.2d 453, 461 (D.C.Cir.1967)); *see also County of Del Norte v. United States,* 732 F.2d 1462, 1466–67 (9th Cir.1984) (applying harmless error rule in context of administrative rulemaking), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *cf. Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L.Ed.2d 659 (1976) (upholding past administrative actions of Federal Election Commission though Commissioners were selected in violation of constitutional principle of separation of powers).[7]

*Sagebrush* exemplifies proper application of the harmless error rule. There, plaintiffs challenged the Secretary of the Interior's failure to give notice and hold hearings as required by the Federal Land Policy and Management Act (FLPMA). The Secretary had, however, held hearings pursuant to the National Environmental Policy Act. We agreed with the plaintiffs that "the notices did not comply in every respect with the terms of [the FLPMA]. However, we [found] the error harmless since the purposes of FLPMA's notice requirement were fully satisfied." 790 F.2d at 764. As to opportunity for comment, we similarly held that although the hearings were not in technical compliance with the statutory requirements the error was harmless because the hearings nevertheless "afforded the public a full and fair opportunity to be heard." *Id.* at 769.

■■■ Although *Sagebrush* dealt with the notice and comment requirements of the FLPMA, we find its reasoning dispositive here. As we explained earlier, all parties

---

**7.** Other circuits (including the D.C. Circuit, which handles administrative cases with numbing regularity) have also applied the harmless error rule to administrative rulemaking. For example, in *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 549 (D.C.Cir. 1983), the court held that "even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless." *See also Shelton v. Marsh,* 902 F.2d 1201, 1206 (6th Cir.1990) ("cases specifically exploring the effect of failure to follow notice procedures have held that the doctrine applies where there is sufficient actual notice").

before us knew the ground rules: that there would be an annual position paper setting proposed weekly volume restrictions; that the NOAC would meet every Tuesday during the season;[8] that the starting point for debate at those Tuesday meetings would be the figure listed for that week in the annual position paper (or in the NOAC's updated versions of it[9]); that there would be opportunity for public comment at the Tuesday meetings; and that the final volume restrictions would be issued by the Secretary soon afterwards. This system of regulation existed for decades without challenge; it was only after some handlers ran into trouble with the Department of Agriculture that, in looking for an escape, they came up with this challenge. While they are right that the Secretary must comply with some of the APA's technical requirements, their belated challenge is evidence of the lack of prejudice resulting from the Secretary's failure to do so in the past thirty-five years.

If the procedural error here is not harmless, it's hard to imagine a case where it would be. While some may argue that would be all for the good, we cannot and will not presume that Congress intended the APA's harmless error rule to be a nullity. The Secretary's failure to comply with the specific dictates of the APA's notice and comment requirements is harmless, and we therefore will not invalidate the volume restrictions issued in the past by the Secretary.

## II

■ Some courts have held that agency action is arbitrary and capricious if "the agency has not really taken a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision-making." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir.1970) (footnote omitted), *cert. denied,* 403 U.S. 923, 91

S.Ct. 2233, 29 L.Ed.2d 701 (1971). Plaintiffs argue that all volume regulations for the years in question must be set aside because the Secretary did not engage in reasoned decision-making.

Plaintiffs base their argument on the fact that the Secretary regularly relied on the NOAC to collect data from the growers and make recommendations for the weekly volume restrictions. The parties agree that the Secretary normally adopts NOAC's recommendation, although he does not always do so. *See* JO, Finding of Fact No. 20, at 86–87.

We have no difficulty with the Secretary's decision to rely on the NOAC to filter and digest public comments and to make a recommendation. Subject to the requirements of the APA, the Federal Advisory Committee Act, 5 U.S.C.App. 2, and other procedural requirements, the Secretary is free to seek advice from whatever sources he deems appropriate, so long as he or his delegate in the Department retains ultimate authority to issue the regulation. *See Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 399, 60 S.Ct. 907, 915, 84 L.Ed. 1263 (1940). Here, the record makes it clear that the Secretary does not rubber stamp the NOAC's recommendations. Although the Secretary normally follows the NOAC's suggestions, he retains the authority to depart from or ignore them altogether.

## III

■ Plaintiffs argue that the Secretary's exemption of navel oranges shipped to markets outside the continental United States and Canada from the volume restrictions violates the statute's "uniform rule" requirement. 7 U.S.C. § 608c(6)(C). The easy answer to this contention is that the statute gives the Secretary discretion to do precisely what he does: He may designate

---

**8.** Plaintiffs do not claim they were unaware of the Tuesday meetings.

**9.** The NOAC has occasionally issued a revised schedule of estimated weekly restrictions to supplement or replace the original schedule. JO at 163.

certain markets to which handlers may ship limited quantities of navel oranges (they're the continental United States and Canada under the current regulations, *see* 7 C.F.R. § 907.18; *id.* § 907.67) and exempt other markets, thereby leaving them open for handlers to ship unlimited quantities. *See* 7 U.S.C. § 608c(6)(C) (allowing Secretary to restrict shipments to "any or all markets"). Shipments to markets other than the designated ones are simply irrelevant in determining whether the rule is uniform.

 Plaintiffs also argue that the fact that *weekly* volume restrictions, calculated as percentages of each district's total crop, occasionally vary among districts is a violation of the uniform rule requirement. But the statute does not require that the Secretary limit every district every week to the same percentage of its crop as other districts. Rather, the Secretary has discretion to adjust allocations among districts during the course of the season; for purposes of the statute, the relevant time period is the season as a whole, not the weeks within it. *See id.*

It's true that during some weeks, and indeed some seasons, certain districts have been completely unrestricted. But those districts were obviously not going to, and did not, meet their full seasonal allotment to the continental United States and Canada. As the Judicial Officer concluded, "volume regulation may not be imposed in a district if it is obvious that the handlers in the district will not be able to use all of the allotments that otherwise would have been given to them." JO Finding of Fact No. 22, at 90. With a couple of de minimis exceptions, during no *season* has the Secretary allocated to any district a percentage of its total available crop greater than to any other district.

## Conclusion

As governments elsewhere loosen their grip over commercial markets, the Secre-tary of Agriculture forges ahead with a government-mandated system of quantity restrictions adopted nearly four decades ago. Whatever the merits of that policy, our concern is procedure, not substance. Though we disapprove of the Secretary's continued reliance on the good cause exception to abandon APA procedures altogether, his failure to do so in the past cannot serve to invalidate old volume restrictions.

On remand, the district court shall give the Secretary an appropriate period to comply with this opinion—at the latest by the time the Secretary begins imposing weekly volume restrictions for the 1992–93 navel orange season. To summarize, the Secretary must:

(1) publish an advance notice of the Tuesday NOAC meetings in the *Federal Register*, preferably at least a week ahead of time, which should include the time and place of the NOAC meeting, the legal authority for the proposed restriction and a tentative projection of the volume restriction for the week to follow the meeting; and

(2) allow parties to submit written comments to the NOAC and the Secretary in lieu of or in addition to permitting oral participation at the NOAC meeting.

AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.