IKUTA, Circuit Judge,
dissenting:
This is a tale of two errors. First, the DOE erred by not consulting with affected states at the threshold of a massive, yearlong, nationwide study of electric transmission congestion. But this error was harmless. Petitioners have not shown that DOE’s error prevented them from submitting information or making arguments to DOE, nor have they shown that DOE would have made a different decision absent the error. In short, they have failed to offer even a scintilla of evidence to establish prejudice. Under controlling Supreme Court precedent, therefore, we must uphold DOE’s actions. Shinseki v. Sanders, — U.S. -, 129 S.Ct. 1696, 1704-06, 173 L.Ed.2d 532 (2009).
But here is where the second error comes in, namely, the majority’s ruling that DOE must complete the entire process again even though its consultation error caused no harm. Instead of recognizing that Sanders rejected the presumption of prejudice articulated in Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487 (9th Cir.1992), the majority employs this discredited approach to nullify DOE’s efforts. In doing so, the majority inflicts the only real injury in this saga. I respectfully dissent.
I
Motivated by concerns about the reliability of the national electricity system, Congress instructed DOE to conduct “a study of electric transmission congestion” and use it to “designate any geographic area experiencing electric energy transmission capacity constraints or congestion that adversely affects consumers as a national interest electric transmission corridor.” 16 U.S.C. § 824p(a)(l), (2). DOE’s *1108 efforts resulted in the Congestion Study, 71 Fed.Reg. 45,047 (Aug. 8, 2006), and the Designation Order, 72 Fed.Reg. 56,992 (Oct. 5, 2007), which examined congestion in over 150,000 miles of transmission lines and designated over 119 million acres over ten states as national interest electric transmission corridors (NIETCs).
Although I agree with the majority that the DOE failed to engage “in consultation with affected States,” § 824p, the record shows that this failure neither impacted the outcome of the designation process nor deprived petitioners of the required opportunity to contribute all comments, facts, and analysis that they wished to submit. The affected states had actual notice that DOE was producing a congestion study that would inform its decision to designate NIETCs, and all but two of them actually participated and provided feedback by directly interacting with DOE personnel at various in-person conferences, one-on-one meetings, or conference calls, by submitting written comments, or by some combination of these various channels. Moreover, DOE considered and responded to these comments when it issued its final study and designation order, and no state now claims that it lacked notice of DOE’s invitation to solicit comments or had specific arguments or studies that it was unable to submit. In fact, the petitioners do not (and cannot) demonstrate any prejudice from DOE’s failure to engage in formal consultation: they cannot show that the outcome would have been different had they been formally consulted, nor can they point to any specific information or arguments that they were unable to submit because of the lack of consultation. Accordingly, as explained in detail below, the states’ failure to show any actual harm attributable to the lack of consultation dooms their claims under controlling Supreme Court precedent, Sanders, 129 S.Ct. at 1704-06, and the majority errs in holding otherwise.
II
The Administrative Procedure Act (APA) informs federal courts that, in reviewing agency actions, “due account shall be taken of the rule of prejudicial error.” 5 U.S.C. § 706. This section requires courts to apply the harmless error rule in reviewing challenges to administrative agency proceedings. See, e.g., Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659-60, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (“In administrative law, as in federal civil and criminal litigation, there is a harmless error rule.” (quoting PDK Labs., Inc. v. U.S. DEA 362 F.3d 786, 799 (D.C.Cir.2004))). Although Section 706 of the APA does not specify which party bears the burden of showing that prejudice resulted from alleged agency error, the general rule is that the party challenging an erroneous procedure or ruling must carry the burden. See, e.g., NLRB v. Seine & Line Fishermen’s Union of San Pedro, 374 F.2d 974, 981 (9th Cir.1967) (“ ‘[T]he burden of showing that prejudice has resulted’ is on the party claiming injury from the erroneous rulings.”) (quoting Palmer v. Hoffman, 318 U.S. 109, 116, 63 S.Ct. 477, 87 L.Ed. 645 (1943)).
In a handful of cases involving alleged agency failures to comply with notice, comment, and consultation requirements, we departed from this long-standing rule. We justified this departure based on our concern that the burden for establishing prejudice in such cases was too heavy. As we explained in Riverbend Farms, “if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with APA procedures.” 958 F.2d at 1487. Therefore, we shifted *1109 the burden to the agency by presuming that an agency’s failure to provide notice or consultation was prejudicial. See Paulsen v. Daniels, 413 F.3d 999, 1006 (9th Cir.2005) (presuming that the Bureau of Prisons’s failure to comply with the APA’s notice and comment requirements was prejudicial and thus shifting the burden to the agency to prove otherwise).
A
The Riverbend Farms approach is contrary to the Supreme Court’s recent decision in Sanders. In considering the “rule of prejudicial error” in the agency context, the Supreme Court repudiated the Federal Circuit’s mandatory presumption that certain types of notice errors were per se prejudicial.[1] 129 S.Ct. at 1704. Rejecting a rule that when an agency provides a claimant with notice that is “deficient in any respect,” the agency should presume that the error is prejudicial, id. at 1702, Sanders enunciated a number of general principles. First, the Court prohibited reliance on a mandatory presumption of prejudice because doing so would frustrate Congress’s express preference for determining the harmlessness of an error on a fact-specific, case-by-case basis. Id. at 1705. Second, the Court held that “the burden of showing that an error is harmful normally falls upon the party attacking the agency’s determination.” Id. at 1706. Unless the circumstances of the case “make clear to the appellate judge that the ruling, if erroneous, was harmful,” the party seeking reversal must “marshal[] the facts and evidence” to establish prejudice and “explain why the erroneous ruling caused harm.” Id. at 1706. In this regard, the Court specifically disapproved the challenger’s argument for “the creation of a special rule” that placed “upon the agency the burden of proving that a notice error did not cause harm.” Id. Third, the Court held that while courts “may sometimes make empirically based generalizations about what kinds of errors are likely, as a factual matter, to prove harmful,” such generalizations must be based on case-specific factors; they cannot be rigid, mandatory presumptions. Id. at 1707. The factors that inform such generalizations are best left to the court that “sees sufficient case-specific raw material” so as to draw such empirical conclusions. Id.
Thus, Sanders instructs federal appellate courts that they must take a case-by-case approach to determining whether an agency’s error, whether procedural or substantive, has a harmful effect. Under Sanders, we may neither presume prejudice nor place the burden of proof on the agency to disprove prejudice. The Supreme Court’s direction to apply “the same kind of ‘harmless-error’ rule that courts ordinarily apply in civil cases,” id. at 1704, *1110 and to eschew presumptions in favor of a case-specific approach is “clearly irreconcilable” with the rule that an agency’s notice and comment failure “is harmless only where the agency’s mistake ‘clearly had no bearing on the procedure used,’” Riverbend Farms, 958 F.2d at 1487 (quoting Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-65 (9th Cir.1986)). Therefore, our burden-shifting presumption of prejudice has been superseded. See Miller v. Gammie, 335 F.3d 889, 892-93 (9th Cir.2003) (en banc). Indeed, we are “bound by the later and controlling authority, and [must] reject the prior circuit opinion as having been effectively overruled.” Id. at 893.
B
Despite the majority’s insistence to the contrary, Maj. Op. at 1094 n. 21, the concern that animated our rule in the River-bend Farms line of cases, namely that it would be impossible for plaintiffs to establish prejudice as a result of procedural errors, was unwarranted. As noted above, we based the burden-shifting presumption of prejudice approach on the concern that it would be virtually impossible to mount a successful challenge to an agency’s procedural error. This conclusion, in turn, was based on the assumption that a petitioner could demonstrate prejudice only by showing that an agency’s outcome would have been different absent the error. River-bend Farms, 958 F.2d at 1487. But as shown by our sister circuits, this assumption is not correct: a party can also show prejudice by establishing that an agency’s procedural error “prevented specific facts or arguments from being presented to an agency and entered into the administrative record” or that the error prevented the petitioner from mounting a “credible challenge” to the agency action. Craig Smith, Taking “Dus Account” of the APA’s Prejudicial-Error Rule, 96 Va. L.Rev. 1727, 1744, 1746 (2010) (citing cases). This “record-based” approach, see id. at 1744, is consistent with the basic agency law principle that “notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested parties notice and an opportunity to comment,” Chrysler Corp. v. Brown, 441 U.S. 281, 316, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); see also Sanders, 129 S.Ct. at 1707 (stating that in evaluating an agency’s error for harmlessness, a reviewing court could consider “the error’s likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings.”).
The D.C. Circuit has applied this record-based test in a number of key eases. In Gerber v. Norton, 294 F.3d 173 (D.C.Cir.2002), for example, the U.S. Fish & Wildlife Service issued an incidental take permit allowing real estate developers to build on an area inhabited by the endangered Delmarva fox squirrel. Id. at 175-76. Although the Service published the draft take permit, it erred by failing to publish a map of the proposed mitigation site for the squirrels. Id. at 177, 179. After a conservation group challenged this error, the D.C. Circuit held that the challengers successfully demonstrated prejudice by identifying three specific critiques of the permit that they would have provided had they seen the map. Id. at 182. In reaching this conclusion, the court articulated the rule that in order to show prejudice, “a plaintiff must indicate with ‘reasonable specificity’ what portions of the documents it objects to and how it might have responded if given the opportunity.” Id. at 182 (internal quotation marks omitted). Similarly, in Owner-Operator Indep. Drivers Ass’n, Inc. v. Fed. Motor Carrier Safety Admin., the D.C. Circuit held that the petitioner satisfied its burden of establishing prejudice by raising arguments that *1111 “amply demonstrate[d] that it would have mounted a ‘credible challenge’ had it been afforded an opportunity to do so.” 494 F.3d 188, 202-03 (D.C.Cir.2007).[2]
Other circuits have likewise adopted the D.C. Circuit’s rule for showing prejudice when the agency has made a procedural error. See, e.g., Miami-Dade Cnty. v. EPA, 529 F.3d 1049, 1061 (11th Cir.2008) (citing the D.C. Circuit’s decision in Owner-Operator and holding that to show prejudice from the lack of opportunity to comment on a proposed rule, the petitioner “must indicate with reasonable specificity the aspect of the rule to which it objects and how it might have responded if given the opportunity” (internal quotation marks omitted)); Conservation Law Found, v. Evans, 360 F.3d 21, 29-30 (1st Cir.2004) (holding that agency’s failure to demonstrate good cause for waiving notice and comment requirement was harmless since conservation groups could not identify any comment that they were prevented from making and that would have made a difference in the result); Texas v. Lyng, 868 F.2d 795, 800 (5th Cir.1989) (holding that agency’s procedural error was harmless because “appellants [did] not explain what they would have said in response to the ... report” and “[did] not identify any new information they would have submitted to the agency if given the opportunity”).
Indeed, we have applied a similar principle on occasion. See Safari Aviation, Inc. v. Garvey, 300 F.3d 1144, 1152 (9th Cir.2002) (concluding that agency’s failure to consider comments before promulgating a final rule was harmless because the substance of the comments had been “extensively commented on and discussed in previous rulemaking proceedings”).
In sum, a challenger can carry its burden of showing prejudice from an agency’s procedural error by demonstrating “with reasonable specificity” that it could present specific facts or arguments to an agency “that may allow it to mount a credible challenge,” or can point to key “omissions in data and methodology” that makes the agency’s decision unreliable. Am. Radio, 524 F.3d at 237-38 (internal quotation marks omitted). Under this standard, the concern we expressed in Riverbend Farms, that a challenger could never succeed in showing prejudice due to a procedural error, is unwarranted, and so is any presumption of prejudice based on that concern.
Ill
Rather than comply with Sanders in this case, the majority applies Riverbend Farm’s superseded presumption of prejudice, holding that an error is not harmless unless it “clearly had no bearing on the procedure used or the substance of [the] decision reached.” Maj. Op. at 1090 (quoting Riverbend Farms, 958 F.2d at 1487). Because this articulation of the harmless error rule requires the agency to prove a negative, that an error “clearly had no *1112 bearing” on its procedure or decision, the test effectively presumes prejudice and shifts the burden to the agency to prove otherwise. Indeed, this language not only creates a presumption of prejudice, it also suggests that a procedural error is prejudicial per se, because it is doubtful that an agency could ever carry the heavy burden of proving that a procedural error “clearly had no bearing on the procedure used.” Id. (emphasis added). Building on this language, the majority indicates that a failure to consult is per se prejudicial because it affects “the interactive process itself.”[3] Maj. Op at 1092.
The majority’s adherence to the presumption of prejudice rejected by Sanders is demonstrated by its explanation of how the petitioners in this case proved harm. First, according to the majority, the affected states have shown harm because they did not have an opportunity to consult before DOE finalized its decision. Maj. Op. at 1092-93 (alteration in original). This is nothing but a tautology (the affected states were harmed by DOE’s failure to consult because the DOE failed to consult with them), and a presumption of prejudice by another name.[4]
The majority’s further explanation that the affected states have shown prejudice because DOE made a discretionary decision, and when an agency makes a discretionary decision, it might be influenced by consultation, is just another tautology. Maj. Op. at 1093. Specifically, the majority claims that DOE “admit[ted] that its determinations and conclusions in the Congestion Study were not decisions compelled by some mathematical formulae, but important discretionary decisions for which there was little guidance,” and that in such situations, “[t]he value of consulting with an agency before it makes a decision is greatest.” Id. In other words, the states are harmed by the failure to consult because they did not have the opportunity to consult. Again, this is nothing more than a restatement of the presumption that when an agency fails to consult, it is per se prejudicial.
As a review of the record amply demonstrates, if the majority had complied with Sanders, 129 S.Ct. at 1704-06, and placed the burden of showing prejudice on the affected states, it would have concluded that DOE’s error was harmless. First, the affected states were well aware of DOE’s plans for the study and NIETC designation. Six months before issuing its congestion study, DOE published a Notice of Inquiry in the Federal Register seeking comments and information relevant to DOE’s plans for conducting the congestion study. Through this notice, DOE requested “comments on draft criteria for gauging the suitability of geographic areas as NIETCs and announce[d] a public technical conference concerning the criteria for evaluation of candidate areas as NIETCs.” *1113 71 FecLReg. 5660, 5660 (Feb. 2, 2006). DOE specifically stated that it would “consider well-supported recommendations from affected States and interested parties throughout the study process regarding areas believed to merit urgent attention from the Department.” Id. at 5661. The notice also contained lists of “transmission plans and studies” already under review by DOE, and asked the public to send information about “existing, specific transmission studies and other plans,” that DOE should review. Id. at 5662.
Second, the states not only had the opportunity to comment on how the study should be conducted, but they used the opportunity to do so. Many states and state entities submitted comments in response to DOE’s notice, including most of the state petitioners in this case and entities from those states. Specifically, representatives from the California Energy Commission, California Public Utilities Commission, Arkansas Public Service Commission, and Illinois Commerce Commission were conference panelists at a public technical conference where DOE discussed issues raised by commenters regarding the ongoing Congestion Study. Conference participants also included officials from Iowa, New York, California, Illinois, Arkansas, Wyoming, Florida, Pennsylvania, Michigan, Kentucky, New Jersey, Vermont, Idaho, New Mexico, Utah, and the District of Columbia.
DOE also reached out to affected states through multiple meetings with the National Association of Regulatory Utility Commissioners (NARUC), a quasi-governmental organization that includes representatives of all fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands, and whose membership represents all of the state commissions responsible for economic and safety regulation of the retail operations of utilities. Similarly, DOE participated in conference calls with representatives from state entities, and met and corresponded with the New York Public Service Commission and the Florida Public Service Commission, the Connecticut Department of Public Utility Control, the New Jersey Board of Public Utilities, the California Public Utilities Commission, and the Pennsylvania Public Utilities Commission.
Given the undisputed fact that the affected states had ample opportunity to provide their views to DOE, Maj. Op. at 1090-91, which received and considered them,[5] petitioners must show some other basis for their claim that DOE’s failure to consult was harmful. They have failed to carry this burden. Indeed, the petitioners’ briefs barely address the issue of prejudice, let alone marshal evidence showing what harm the petitioners suffered, what specific information they would have provided that was not already in the record, or how consultation would have affected the outcome of DOE’s decisionmaking process.
The Western States assert merely that DOE failed to respond to the request for consultation by five Arizona commissioners. Without more, this fails to show that the Western States suffered any harm. And the Western States do not provide any further evidence of prejudice: they do not state how consultation would have affected the outcome of DOE’s Congestion Study or NIETC designation, nor do they *1114 explain with “reasonable specificity” what additional information or arguments they could have made had they been consulted. See Mkt. St Ry. v. R.R. Comm’n of Cal, 324 U.S. 548, 561-62, 65 S.Ct. 770, 89 L.Ed. 1171 (1945) (holding the Railroad Commission’s error harmless “in the absence of any showing of ... prejudice” by the petitioners who made “[n]o contention ... that the information was erroneous or was misunderstood by the Commission, and no contention ... that the Company could have disproved it or explained away its effect for the purpose for which the Commission used it”). Having failed to show prejudice, the Western States cannot prevail on their claim merely because DOE made a technical error.
The Eastern States similarly fail to show prejudice. In attempting to do so, they raise only a single argument, namely that DOE incorrectly interpreted data “as to the location and magnitude of congestion in New York.” The Eastern States argue that DOE’s “incorrect and flawed” documentation and interpretation of data could have been prevented if DOE had consulted with the New York Public Service Commission (NYSPC), which could have identified discrepancies between data from the Congestion Study and the 2005 State of the Market Report prepared by the New York Independent System Operator (NYISO).
This argument is belied by the record. After the Congestion Study was complete, NYSPC informed DOE about alleged material discrepancies between DOE’s study and the 2005 report produced by NYISO. In response, DOE explained that the discrepancies and reporting errors identified by New York “did not affect the analysis and findings of the Congestion Study.” 72 Fed.Reg. 25,838, 25,859 (May 7, 2007). Specifically, DOE explained that “NYISO market data on congestion are not directly comparable to the Congestion Study’s simulation results” because the congestion study simulations reflect forward-looking data while NYISO relied on real-time congestion data. Id. at 25,858. In addition, DOE explained, its Congestion Study simulations reflected NYISO’s “planning” data, whereas NYISO’s report was based on its “operational” data. Id. Finally, according to the DOE, the Congestion Study accounted for new generation capacity that was added after NYISO’s study, and considered future capacity additions as well. Id. at 25,859.
Because DOE considered the Eastern States’ concerns and offered a reasonable explanation for the discrepancies identified by the NYSPC, the Eastern States have failed to show that had DOE consulted with New York, DOE would have interpreted this data differently or reached a different decision. Nor do the Eastern States identify any additional facts and information they would have supplied, or different arguments they would have made, had they been consulted. Therefore, the Eastern States have not carried their burden of showing that they were prejudiced by DOE’s failure to consult.
In holding that DOE’s failure to consult with the states was per se prejudicial, despite the states’ failure to demonstrate any harm, the majority employs the sort of mandatory presumption rejected in Sanders. The majority attempts to distinguish Sanders on the ground that it involved a notice error rather than a consultation error, see Maj. Op. at 1090-91, asserting that a notice error is harmful only if it affects the outcome of agency decisionmaking, while a consultation error is harmful in itself because Congress intended for there to be consultation, and a consultation error deprives parties of the opportunity to consult. Maj. Op. at 1090-91. But Sanders’s prejudicial error principles cannot be so *1115 confined. In considering whether an error is harmless, there is no principled basis for distinguishing among any of the steps an agency must take before reaching its final decision, whether the step involves consultation, notice and comment, or merely notice. While an error in fulfilling any of these steps necessarily affects the decisionmaking process, a plaintiff must prove that such an error actually caused harm. Because there is no evidence of prejudice beyond the mere fact that DOE failed to consult the affected states, nor any basis for the majority’s assertion that there is “substantial doubt as to whether DOE would have made the same findings had it consulted "with the affected States,” Maj. Op. at 1093 (quoting Kurzon v. United States Postal Service, 539 F.2d 788 (1st Cir.1976)), the majority errs in invalidating the DOE’s Congestion Study and Designation Order.
IV
The majority compounds its error by reaching out to discuss DOE’s decision not to prepare NEPA documentation regarding the potential environmental impacts of the Designation Order. Maj. Op. at 1102-04. Because the majority vacates the Designation Order, its discussion of this issue is entirely superfluous. Worse, the majority is entirely wrong in concluding that DOE’s decision is a harmful error. In fact, DOE adequately complied with NEPA, 42 U.S.C. § 4332(2)(C), by documenting its determination that no environmental impact statement (EIS) was required in the Designation Order.
The Supreme Court has set a practical limit to NEPA’s requirement that federal agencies document the environmental impact of proposed programs. Where “it is impossible to predict” the level of activity that will occur in a region, it is “impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity.” Kleppe v. Sierra Club, 427 U.S. 390, 402, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Under such circumstances, any attempt to prepare an environmental analysis “would be little more than a study ... containing estimates of potential development and attendant environmental consequences.” Id. In other words, unless there is a plan for development that defines “fairly precisely the scope and limits of the proposed development of the region,” there is “no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA.” Id.
Applying such a practical common sense limitation, we have likewise held that an EIS was not necessary for an action plan prepared by the Forest Service because it was a broad program lacking any identifiable concrete effects, did not call for specific activities with a direct impact on a particular site, did not propose site specific activity, and did not call for specific actions directly impacting the physical environment. Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 668-70 (9th Cir.1998). The Fourth Circuit adopted a similar approach in deciding that FERC was not required to prepare an environmental assessment (EA) or EIS in connection with its promulgation of regulations governing the process for issuing permits for the construction or modification of electric transmission facilities in areas designated as national interest corridors. Piedmont Envtl. Council v. FERC, 558 F.3d 304, 316-17 (4th Cir.2009). As the Fourth Circuit explained, such environmental planning would have no practical value, because FERC could not identify projects that are likely to be sited and permitted, and thus did not have “information about the ultimate geographic footprint of the permitting program.” Id. at 316. In the *1116 absence of such information, FERC could not present “a credible forward look [that] would ... be a useful tool for basic program planning.” Id. In other words, NEPA does not require a futile act: if it is not possible to connect a federal plan to any particular action on the ground, there is no purpose in preparing an environmental study about the effects of that plan.
The Supreme Court’s common sense rule applies to DOE’s Designation Order because the order cannot be connected to any particular action on the ground. In explaining why it cannot meaningfully examine environmental impacts of the designation of NIETCs, the Designation Order notes, “National Corridor designations have no environmental impact” because “[t]hey are only designations of geographic areas in which DOE has identified electric congestion or constraint problems.” Other than identifying the 119 million acres where congestion is a problem, the DOE “cannot determine the number, size, or location of new transmission facilities that might be permitted within the National Corridors.” Nor does DOE “know whether any new electricity generation, or what type of generation, will develop in the future.” Further, DOE “has no control over how and when any such development might occur and therefore cannot predict or estimate its impacts.” Likewise, the siting decisions that may be made by FERC and various state agencies in the future are “too attenuated” and “speculative” to be meaningfully evaluated at the designation stage.
Ultimately, because “[c]umulative impacts are speculative” and DOE cannot predict the level of activity that will occur anywhere in the 119 million acres it has designated, it cannot analyze the possible impacts, resource commitments, or alternatives. As in Kleppe, any environmental report would “be little more than a study ... containing estimates of potential development and attendant environmental consequences.” 427 U.S. at 402, 96 S.Ct. 2718. Such environmental planning would have no practical value; it could not present “a credible forward look that would be a useful tool for basic program planning.” Piedmont Envtl. Council, 558 F.3d at 316.
The majority points to the efforts by DOE and Bureau of Land Management (BLM) to prepare a Programmatic EIS for a much smaller project that involved the designation of energy corridors solely on federal land. Maj. Op. at 1101-02. Rather than serve as evidence that DOE could have prepared a meaningful environmental report in this case, as the majority claims, the PEIS in fact documents the opposite. The PEIS admits up front that the agencies cannot make any predictions about “whether or where future applicants would seek to site their projects,” or about what sort of project might “be proposed at a particular location (e.g., an underground pipeline as opposed to an aboveground transmission line).” Nor can the agencies predict whether any potential future project “would involve electricity, gas, hydrogen, or oil energy transport systems.” At this level of generality, it is not surprising that the agencies concluded that land use impacts from designating corridors on federal land are substantially the same as the land use impacts from not designating such corridors. See Dep’t of Energy et al., Programmatic Environmental Impact Statement, Designation of Energy Corridors on Federal land in the 11 Western States, S-25 (Nov.2008). The agencies are even blunter in their consideration of the effect the corridor designation project has on endangered species: “without knowing the specifics of when and where a project would occur within a corridor,” or what such a project would entail, there was “no credible basis” on which to base a biological assessment.
*1117 To the extent that an EA was required under DOE’s regulations, 40 C.F.R. § 1501.4(b), DOE satisfied that requirement in the Designation Order itself. An EA is “a concise public document” that provides an agency “sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.” 40 C.F.R. § 1508.9(a)(1). As explained above, the Designation Order provided a reasoned discussion of the relevant factors and concluded that an EIS was not required because DOE could not meaningfully evaluate environmental impacts at this juncture. In light of DOE’s reasoned statements, the majority errs in suggesting that DOE did not “adequately explain its decision.” Maj. Op. at 1097 (quoting Alaska Ctr. for Env’t v. U.S. Forest Serv., 189 F.3d 851, 859 (9th Cir.1999)).[6] Again, the majority departs from the Supreme Court’s direction that courts should not function as “citadels of technicality” that automatically reverse agency action for errors that have no actual impact. Sanders, 129 S.Ct. at 1705 (quoting Kotteakos, 328 U.S. at 759, 66 S.Ct. 1239); see also McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).
V
Instead of taking the common sense approach mandated by the Supreme Court in reviewing agency action, the majority here invalidates two important studies because of a technical procedural error that had no adverse effect. The majority takes this step in reliance on precedent that has been superseded by the Supreme Court. Its unnecessary exposition of federal environmental law is equally flawed, ignoring both controlling Supreme Court precedent and common sense. I respectfully dissent.

. Though Sanders addressed the harmless error standard in the context of appeals from the United States Court of Appeals for Veterans Claims, the Court made clear that its articulation of the harmless error rule applies to our interpretation of the APA in all administrative contexts. Specifically, the Supreme Court stated that the requirement that the Veterans Court "take due account of the rule of prejudicial error,” 38 U.S.C. § 7261(b)(2), should be interpreted in the same manner as § 706 in the APA. Sanders, 129 S.Ct. at 1704. Our sister circuits have complied with this directive by interpreting Sanders as a clarification of the harmless error standard in other agency contexts. See, e.g., Jicarilla Apache Nation v. U.S. Dept. of Interior, 613 F.3d 1112, 1121 (D.C.Cir.2010) (citing and applying Sanders in a suit by an Indian tribe against the Department of the Interior); In re Chapman, 595 F.3d 1330, 1338-40 (Fed.Cir.2010) (citing and applying Sanders in the patent context). Commentators have also acknowledged Sanders’s effect on the harmless error rule in the administrative agency context. See Craig Smith, Taking “Due Account” of the APA's Prejudicial-Error Rule, 96 Va. L.Rev. 1727, 1740 (2010).

. See also Am. Radio Relay League, Inc. v. FCC, 524 F.3d 227, 230, 237-38 (D.C.Cir.2008) (holding that the FCC's failure to comply with notice-and-comment requirements was not harmless error because the appellant showed that redacted portions of FCC reports "appear[ed] to contain information in tension with the [Commission's] conclusion” and that it could offer commentary that would illuminate unaddressed strengths and weaknesses of the FCC’s data (second alteration in original) (internal quotation marks omitted)); U.S. Telecom Ass’n v. FCC, 400 F.3d 29, 41 (D.C.Cir.2005) (holding that the challengers had failed to show prejudice from the agency's failure to label its notice as “Notice of Proposed Rulemaking” where “they cannot identify a single additional comment that they would have made but for the labeling of the notice, nor any other deficiency in the rule-making process.”).

. In fact, Riverbend Farms did not hold that the failure to engage in notice and comment was per se prejudicial: it clarified that such a procedural error is harmless where its purpose has been satisfied, id. at 1477, and concluded that the agency’s failure to comply with a notice and comment requirement in that case was harmless. Id. at 1488. Thus, in indicating that a failure to consult with the states is per se prejudicial, the majority goes beyond the holding in Riverbend Farms.

. The majority also suggests that per Sanders, it could make an "empirically based generalization[]” that "a failure to consult prior to making a discretionary decision, when such consultation is mandated by law, is the type of error that is likely to prove harmful.” Maj. Op. at 1093 n. 18 (quoting Sanders, 129 S.Ct. at 1707). But the majority is not offering an "empirically based generalization,” permitted by Sanders because the majority provides no empirical evidence that a failure to consult caused any actual harm. There is no such evidence in this case.

. Indeed, the state petitioners concede that only two states, Virginia and Arizona, did not submit comments or otherwise avail themselves of the consultation opportunities afforded by DOE during its creation of the Congestion Study. Neither state suggested that it did not have actual notice of DOE’s Congestion Study, and neither state alleged it had new information that it would have presented had it been consulted by DOE.

. Though the majority does not reach the states' arguments that DOE violated the Endangered Species Act, 16 U.S.C. § 1536(a)(2), and the National Historical Preservation Act (NHPA), 16 U.S.C. § 470f, I would also hold that DOE's statutory obligations were not triggered under either statute because the effects of the Designation Order on endangered species, critical habitats, and historic properties were too speculative.